CAPISTRANO UNIFIED SCHOOL
DISTRICT, Plaintiff–
Appellant,

v.

Jeremy WARTENBERG, By and Through
His Parents, Wayne & Charlene WAR-
TENBERG, in Their Individual Capacity
and on Behalf of Jeremy Wartenberg;
California Department of Education;
California Superintendent of Public In-
struction, Defendants–Appellees.

CAPISTRANO UNIFIED SCHOOL
DISTRICT, Plaintiff–Counter–
Defendant–Appellant,

v.

Jeremy WARTENBERG, By and Through
His Parents, Wayne & Charlene WAR-
TENBERG, in Their Individual Capacity
and on Behalf of Jeremy Wartenberg;
California Department of Education;
California Superintendent of Public In-
struction; McGeorge School of Law;
Marguerita Fa–Kaji, Defendants–Appel-
lees,

and

Wayne Wartenberg; Charlene
Wartenberg, Counter–
Defendants–Appellees.

Nos. 92–56119, 92–56312.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1994.

Decided July 5, 1995.

Jane Slenkovich (argued), and Eliza Walendzik (on the briefs), Law Offices of Jane E. Slenkovich, Saratoga, CA, for plaintiff-appellant.

Joan K. Honeycutt, Tustin, CA, for defendants-appellees.

Before BROWNING, FERGUSON and KLEINFELD, Circuit Judges.

Opinion by Judge KLEINFELD; Dissent by Judge FERGUSON.

KLEINFELD, Circuit Judge:

This case requires us to determine how a district court is supposed to review the decision of a hearing officer under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., and whether the services the school district offered in this case satisfy the Act's requirement that each child be afforded a "free appropriate public education." 20 U.S.C. § 1401(a)(18).

## I. FACTS

The dispute in this case is about whether the school district must pay the private school tuition which Jeremy Wartenberg's parents incurred for him and their attorneys' fees. Under the Individuals With Disabilities Education Act, the answer to the question depends on whether the reason Jeremy Wartenberg did poorly at school was misbehavior or a learning disability. If the decisions below finding that disability caused Jeremy's school failure are correct, then we must determine whether the program the public school developed for him was appropriate. The result turns largely on whether the district court applied the proper standard of review to the administrative determination. The facts were developed in a ten-day

long hearing before a hearing officer and are summarized below.

When these proceedings began, Jeremy Wartenberg was a 16–year–old boy. He had always done very badly in school. Various psychologists and counselors diagnosed him as having both "attention deficit disorder" and a "conduct disorder." He began receiving special educational services in second grade, based on what the school counselors called "visual motor integration" and "visual closure deficits."

In seventh grade, his parents hospitalized Jeremy for several months at College Hospital because of his aggressive, violent behavioral problems, including violent and dangerous attacks on his mother and cruelty toward his baby brother, setting fires, shoplifting and lying. Jeremy had taken Ritalin[1] since age four, but it had not helped. In a report following a psychiatric and mental status examination of Jeremy, the hospital psychiatrist noted that Jeremy's intelligence seemed to be average, but his "thought content revealed flight of ideas" and his "insight and judgment were poor."

At the hospital, Jeremy was given an electroencephalogram, and his results were abnormal. The neuropsychologist's impression was that his misbehavior was caused by a neurological abnormality, which might have resulted from a high fever and convulsion when Jeremy was an infant. The doctor concluded that:

> Although clearly the patient does not exhibit any severe neurophysiological deficits, there does appear to be an underlying neurological/cognitive basis to his behavioral and emotional disturbances. This may be related to his early experience of roseola and febrile seizures at age two, which has contributed to a life long history of hyperactivity, difficulties with learning, and difficulties with controlling behavioral impulses. The data suggests a right anterior type of brain dysfunction and anterior frontal lobe functions seem to be at least mildly impaired. This data needs to be

corroborated with further electrophysical studies. *The patient certainly does require a very structured learning environment and medications need to be closely considered by the attending physician for both purposes of improving attention span and problem solving skills, and to rule out the existence of some sort of subclinical seizure problem.*

(emphasis added).

During the same time period, Jeremy saw a physician specializing in adolescent medicine, who thought Jeremy's failings were caused both by the way he behaved and by "neurochemical contributors":

> Jeremy's problems with distractibility, impulsiveness, and emotional lability are extreme and have both behavioral and neurochemical contributors.
>
> *I feel that a fulltime residential school setting at the present time would best fit Jeremy's needs.*

(emphasis added).

On discharge from the hospital, Jeremy's treating psychologist wrote that, during his stay, Jeremy had "demonstrated extremely poor impulse control or ability to attend and concentrate." The doctor characterized Jeremy's hospital stay as "stormy," with "numerous angry outbursts, great difficulty following directions, labile moods fluctuating between periods of extreme anger and aggressiveness and periods of deep depression." The psychologist concluded that without an institutional placement, at least during the day, the boy would get no better:

> It is clear from our assessment and his past history that this young man is presenting emotionally, intellectually and socially much younger than his chronological 14 years. At this point it appears that in order to avoid further significant morbidity and mortality as well as decrease the risk for future multiple acute hospitalizations that *Jeremy will require a controlled, structured, intense day treatment, or residential placement.* This type of environ-

---

1. A pharmaceutical used "as an integral part of a total treatment program ... for a stabilizing effect in children with a behavioral syndrome characterized by ... moderate to severe distrac-

tibility, short attention span, hyperactivity, emotional lability, and impulsivity." Physicians' Desk Reference 909 (1993).

ment will impact positively on his long term prognosis and offer him the opportunity to develop the behavioral controls, psychological mechanisms as well as educational and vocational training needed so that he can develop into an independently functioning adult. *Without this structure this development will most likely fix at the present point and as has been indicated, this young man will continue to experience significant problems.*

(emphasis added).

After his hospitalization, Jeremy returned to school and continued to do very badly. Despite the clear indications from all treating physicians that Jeremy needed a very structured educational environment, the school initially placed Jeremy in regular classes, where, by the next fall, he was failing all of his eighth-grade classes.

In response to his failure in the regular class setting, his junior high school gathered a team to develop an "individualized education program." The team determined that Jeremy had a "disorder in visual processing and attention deficit result[ing] in [a] significant discrepancy between achievement and ability in math." They authorized Jeremy to spend one period each day with a research specialist, who would provide specific assistance "in math, written language and organizational skills." Jeremy failed English and physical education, but was passed on from junior high school to the ninth grade, high school, anyway.

The move to Capistrano High School did not improve Jeremy's performance. He continued to do very badly in class, so the school crafted a new "individualized education program" that included an increase in the number of hours spent each day with a "resource specialist." It did no good. His ninth grade report card after first semester showed grades of D+, F, F, D, D−, and F. The school then created another special education program for him, which included four periods each day in a special education class and one period per day with a resource specialist, who would work on the continued discrepancy between Jeremy's ability and performance in math and written language. Despite the school's continued efforts, Jeremy failed all six classes.

After he flunked every course in his first year of high school, the school created yet another "individualized education program" for him. This time, the new program *decreased* the attention Jeremy was scheduled to receive. His time in the special educational setting was reduced to three periods per day and the description of his specific learning disability was modified to eliminate any reference to a deficit in math abilities.

The Wartenbergs thought this was a bad plan. They refused to consent to this decrease in assistance, and exercised their right under the controlling federal legislation to call for an "impartial due process hearing" to review the school district's decision. 20 U.S.C. § 1415(b). They also took Jeremy out of the public high school, and put him at the Mardan Center of Educational Therapy. The Mardan Center is a private but state certified school which Jeremy's parents thought could help him more than the public school would under the proposed "individualized education program." This placement is the basis for the dispute in this case.

The school claims its proposed "individualized education program" was appropriate. Jeremy's parents claim that the "individualized education program" was inadequate, that the Mardan Center was appropriate, and that they are entitled to reimbursement of the tuition and fees they spent for the Mardan Center, and the attorneys' fees necessary to prevail in their claims. The "due process hearing" was a ten day presentation of evidence to resolve this dispute.

The school district's main expert witness, the school psychologist who had assessed Jeremy, disagreed to some extent with the evidence summarized above. He thought that ascribing Jeremy's poor performance to some neurochemical deficiency was overly speculative, because the Ritalin therapy did not provide the relief from symptoms he would have expected if Jeremy had a neurochemical imbalance. In his opinion, although Jeremy's performance was far below his ability, his learning disability was not severe. He attributed Jeremy's bad school performance largely to "failure to do the work,

cooperate, and truancies." He thought Jeremy's attention deficit disorder was "mild":

> He has a mild attention deficit which makes it mildly difficult for him to maintain attendance on task. That means that some changes to the environment are in order. At times, especially in areas where he is lower functioning academically, there will be maybe a need for a small group setting. His academic programming needs to be individualized in those areas. And he needs more feedback. He needs—we need to ensure that he gets clear commands and directions from the teacher, which are typical, you know, kind of remedial techniques for students who have [attention deficit disorder].

The school psychologist apparently believed that Jeremy's poor performance could be attributed to a conduct disorder. It became clear in the school psychologist's testimony that the term "conduct disorder," as he used it, described a pattern of bad conduct, rather than diagnosing some organic disorder which caused the bad conduct:

> Q: And with respect to conduct disorder then, would you describe to use what a conduct disorder is?
>
> A: Well it is also a series of criteria. And the way that one determines that one has a conduct disorder is to determine that they have at least three of the thirteen criteria. It is very similar in nature to what's called "Oppositional Defiant Disorder", the difference being that in oppositional defiant disorder the basic rights of others and major age appropriate societal norms are not violated as they are in conduct disorder.
>
> Conduct disorder, for example, you might have somebody who is more aggressive towards others, who is breaking rules, who is very difficult to manage. And I agree with the College Hospital admittance and discharge diagnosis of sever conduct disorder as being one of the primary problems for him.
>
> \*       \*       \*       \*       \*       \*
>
> Q: With respect to people who have conduct disorder, when a person has the diagnosis of conduct disorder, if you know, does that imply or does that mean that his conduct is out of his control or within his control?
>
> A: Generally speaking the conduct is under his control and he is aware of the fact that it is wrong. But he is more interested in meeting his own short term needs than any long term needs of others or himself.

He concluded that there was "a very large element of willfulness about whether [Jeremy] changes or not."

Jeremy's special education teacher for most of his school day was the other witness of considerable importance on the school district side. He testified that "the squeaky wheel gets the grease," and "Jeremy was the squeaky wheel since he was in my program." He thought the cause of Jeremy's failure was "his oppositional behavior." He thought that the appropriate goals and objective for Jeremy were "just too many for one particular teacher to start developing, especially with the attitude that Jeremy exhibits."

In addition to these witnesses, a great deal of other evidence came in on both sides.

The hearing examiner issued a 26 page single-spaced opinion, after hearing the ten days of testimony and examining the extensive exhibits. She reviewed the evidence in detail, and made findings of fact and conclusions of law resolving the case in favor of the Wartenbergs. Construing the Supreme Court's decision in *Board of Education of the Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the hearing officer defined her primary decision-making task on the issue of proper placement as follows:

> In deciding whether the District has met the requirement of providing Jeremy with a free appropriate public education, it is thus necessary to determine whether the placements it has offered include: (1) instruction that is specially designed to meet his unique needs and that would permit him to benefit educationally; (2) sufficient support services to permit him to benefit educationally from the instruction; and (3) instruction and services that comport with the goals and objectives on his IEP.

She concluded that Jeremy's school failure was caused primarily by his attention deficit

disorder, not willful bad conduct, and that the two causes could not be separated out. She also concluded that the school district's "individualized education program" was not appropriate for Jeremy, and that the Mardan Center was, so she directed the school district to pay Jeremy's parents for what they had spent on tuition and transportation for the Mardan Center. Here is a summary of her critical findings of fact:

1. Some of Jeremy's misbehavior might be due to his conduct disorder, rather than his specific learning disability, but his deficit in attention was a substantial cause of his behavioral problems, and Jeremy's social and emotional problems could not be separated out from the symptoms associated with his specific learning disability.

2. The testimony of the school district's and the Wartenberg's experts showed that Jeremy's unique needs included: frequent feedback from a teacher; clear commands; a structured school environment; a small class size; a small campus; and consistency in the educational setting.

3. The school district's proposed placement did not meet the first part of the *Rowley* test, because it could "result in Jeremy having from four to six different teachers ... and would not provide him with the level of structure, individual attention and consistent behavioral management that he need[ed] in order to benefit from his education."

4. The school district's proposed placement also failed the third prong of the *Rowley* test, which requires that the instruction and services offered comport with the goals and objectives on the student's individualized education program. The hearing officer, relying in large part on the testimony of school district teacher DeGeer, found that three periods each day with a resource specialist would never be sufficient to work on all of the goals listed in the fifteen-page educational program developed for Jeremy.

5. The Mardan Center did meet the *Rowley* test and would be an appropriate placement for Jeremy. The hearing officer made this determination based on the facts that the Mardan classes were better staffed than those at the school district; offered education with 11 children in Jeremy's age and ability group; emphasized immediate feedback; and achieved consistency by not forcing Jeremy to change teachers several times each day.

6. The Wartenbergs are entitled to reimbursement for the regular school year education Jeremy received at the Mardan Center, plus transportation costs.

The school district filed this action in district court, pursuant to 20 U.S.C. § 1415, for review of the hearing officer's decision. The Wartenbergs sought attorneys' fees. Both parties moved for summary judgment.

The district judge considered the administrative record from the hearing officer, and received additional evidence presented in the form of affidavits and exhibits.

The school district had asked the district court to retry the case, at least on whatever disputed issues she might find in the record. Its attorney, though, could not think of any additional evidence she wished to introduce at a retrial beyond what was in the record.

The Court: And I guess what I'm saying is, is there yet some additional evidence that this Court doesn't have that's going to be different if there is half a day of trial? That's what I'm really trying to find out.

Ms. Slenkovich [school district's attorney]: I can't think of any.

Court: The parties have been very thorough, and that's why the question arises.

Slenkovich: I can't think of any evidence that we don't have in here off the top of my head.

Court: Let me ask the same question of Miss Honeycutt [attorney for the Wartenbergs], as well as Miss Eckrem.

Honeycutt: If the Court feels there is an issue that the Court needs more information on, then, yes, it would be appropriate to call us back to bring evidence on that issue or issues.

As it stands right now, I feel confident that the evidence necessary to make the decision is before the court.

Court: That's certainly my sense of the state of the record, given everything that we have here.

But if I undertake to decide this case in its procedural fashion, as the parties now present it, come up with an issue that may actually fall within the definition of a material triable issue, and yet this record, in fact, has evidence bearing both ways on that point, if I proceed to then make that decision, will that be in violation of anybody's rights?

Honeycutt: No.

Court: I don't think it will either.

  \*   \*   \*   \*   \*   \*

Court: Is there anything else that any of the parties wanted to call to my attention then before I submit all of these matters for decision? District counsel?

Slenkovich: Yes.

We do not perceive this so much as a Rule 56 [summary judgment] motion as a plenary trial—our appeal. In other words, we believe that you are to—it appears to us that you are to rethink or retry the case, as it were, upon reading the transcript and all of the record.

Thank you.

Court: All right, thank you. Miss Honeycutt?

Honeycutt: Nothing further, your Honor.

Court: And Miss Eckrem?

Eckrem: Nothing further.

The district judge reviewed the evidence before the hearing officer and considered additional evidence before adopting the findings of the hearing officer. She considered his performance at Mardan subsequent to the hearing officer's decision, and found that Jeremy had shown "demonstrable improvement" at Mardan. She also took notice of a Department of Education memorandum which came down subsequent to the administrative proceeding. The memorandum said that children with "attention deficit disorder" should receive special education under the federal legislation. She concluded that Jeremy's parents had properly disagreed with the school district's proposed program, and upheld the hearing officer's conclusions. Her order recited that "[t]here are no disputed facts necessary and material to the issue of whether or not [the school district] offered Jeremy Wartenberg an appropriate placement." After reviewing both the hearing officer's decision and record and the additional factual materials, she upheld the hearing officer's decision. The school district appeals.

## II. ANALYSIS

### A. Mootness

■ The Wartenbergs urge that we lack jurisdiction over the appeal, except for the attorneys' fees issue. The reason is that Jeremy has now graduated from high school and been awarded diplomas by both schools, Mardan and the public school. They argue that he is no longer entitled to the protections of the Act, so the case is moot under the principles of *Honig v. Doe,* 484 U.S. 305, 317–19, 108 S.Ct. 592, 600–02, 98 L.Ed.2d 686 (1988).

We reject the mootness challenge. The Wartenbergs' claim for reimbursement for the Mardan Center tuition is a live controversy. So, as they concede, is the claim for attorneys' fees. This case is not moot. *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings,* 903 F.2d 635, 641 (9th Cir.1990).

### B. District Court Review

■ The school district argues that the district court misunderstood how it was to review the administrative determination, and gave too much deference to the hearing officer's determination. The school district's argument appears to be that the district court should review the findings *de novo,* albeit on the administrative record and such additional submissions as were made in district court.

The mode of review by the district court is puzzling, and gives rise to a principal dispute in this case. The statute provides an unusual formulation of the standard for district court review of an administrative decision. It tells the court to "hear additional evidence" outside the administrative record and then base its decision "on the preponderance of the evidence":

In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

Ordinarily one expects review of an administrative decision to be limited to the record before the administrative body, and for the court to be required to affirm if substantial evidence on the whole record supports the administrative determination. 5 U.S.C. § 706; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993).

We have the benefit of controlling Supreme Court authority construing this unusual judicial review provision. In *Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Court held that the preponderance of the evidence standard in the statute "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. at 3051. The requirement that the district court receive the hearing officer's record "carries with it the implied requirement that due weight shall be given to these proceedings." *Id.* The district court should review for procedural compliance with the statute, and for whether the program is reasonably calculated to enable the child to receive educational benefits.

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–07, 102 S.Ct. at 3051.

The proposition that the courts must give "due weight" raises the question of how much weight is "due." We held in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.1987), that "[h]ow *much* deference to give state educational agencies ... is a matter for the discretion of the courts." Following a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.* (quoting *Town of Burlington v. Department of Education*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994). We review the district court's factual determinations for clear error. *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 588 (9th Cir.1992). But we review *de novo* the ultimate determination of the appropriateness of the educational program. *Smith*, 15 F.3d at 1524.

Our opinion in *Ojai* explores the difficulty of using a summary judgment framework for what amounts to resolution of conflicting evidence on the facts. In that case, as in many under the Act, disputed issues of fact existed. Likewise, in the case at bar, the mixed question of the cause of Jeremy's school failure was disputed. Ordinarily summary judgment could not issue, because of the genuine dispute. But if the district court tried the case anew, the work of the hearing officer would not receive "due weight," and would be largely wasted. As the District of Columbia Circuit put it, "[d]eference to the hearing officer makes sense in a proceeding under the Act for the same reasons that it makes sense in the review of any other agency action—agency expertise, the decision of the political branches ... to vest the decision initially in an agency, and the costs imposed on all parties of having still another person redecide the matter from scratch." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C.Cir. 1988).

Judge Canby pointed out in *Ojai* that what the court had done in that case really amounted to a trial *de novo* on a stipulated record. *Ojai*, 4 F.3d at 1472. This puzzling procedural problem arises whenever the district court adjudicates administrative appeals, because the Federal Rules of Civil Procedure do not plainly speak to how such appeals should be handled. It is hard to see what else the district court could do as a practical matter under the statute except read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations. The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference. Because this appears to be what Congress intended under the Act, we conclude that it is the right thing to do, even though it does not fit well into any pigeonhole of the Federal Rules of Civil Procedure. Though the parties may call the procedure a "motion for summary judgment" in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment.

We conclude that the district court in the case at bar did what it was supposed to. The judge received additional evidence. The parties had no more to offer. The hearing officer's report was especially careful and thorough, so the judge appropriately exercised her discretion to give it quite substantial deference. The judge made her own independent judgment that a preponderance of the evidence supported the hearing officer's findings and conclusions, and so reached the same conclusions.

### C. Appropriate Placement

#### 1. Eligibility Under the Act

If Jeremy's failure at school resulted from misconduct, not a disorder, then he would not be entitled to have the school pay for his Mardan Center tuition and transportation. Likewise, if his failure was caused by a disorder, but the school's proposed individualized education program was appropriate, or Mardan Center was not appropriate, he would not be so entitled.

Under the Act, states may receive federal assistance for education of "children with disabilities" if "[t]he state has in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1). Some learning disorders count as "specific learning disabilities," and some do not:

(a)(1)(A) The term "children with disabilities" means children—

(i) with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, *serious emotional disturbance*, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, *by reason thereof*, need special education and related services.

\* \* \* \* \* \*

(a)(15) The term "children with specific learning disabilities" means those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are *primarily* the result of visual, hearing, or motor disabilities, of mental retardation, of *emotional disturbance*, or of environmental, cultural, or economic disadvantage.

20 U.S.C. §§ 1401(a)(1), (15) (emphasis added).

So, a child with a specific learning disability caused by any number of factors will qualify for assistance, while a child with a specific learning disability which is "primarily the result of [non-"serious"] emotional disturbance" will not. 20 U.S.C. § 1401(a)(15); 34 C.F.R. § 300.7(b)(10).

Once it is determined that a child suffers from a covered "learning disability," he is entitled to receive a "free appropriate public education." In order to comply with the requirement of providing a free appropriate public education, the school district must provide special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(a)(5)].

20 U.S.C. § 1401(a)(18).

■ As construed by *Rowley*, a child receives a free appropriate public education if the program (1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities, and (3) is in accord with the individualized education program. *Rowley*, 458 U.S. at 188–89, 102 S.Ct. at 3041–42. If Jeremy was eligible for assistance under the terms of the Act, these provisions applied to him, and the school district was bound to address his unique needs in a manner that would afford him an opportunity to benefit educationally.

■ The record supported the hearing officer's and district judge's independent conclusions that Jeremy's failure at school was caused by specific learning disabilities, not mere social maladjustment, and that his learning disorder was not "primarily the result of emotional disturbance" or other non-covered causes. 34 C.F.R. § 300.7(b)(10). The hearing officer and the district court found that "Jeremy's disorder in attention is the processing disorder that is the *primary cause* of his specific learning disability." This conclusion was reached by the school district's expert, school psychologist Steve Gelsinger and was accepted by the hearing officer. The testimony showed that Jeremy's bad behavior, including impulsiveness, rebel-

lion against authority, and poor performance absent immediate feedback, was, as the hearing officer put it, caused by his attention deficit disorder:

> Based on Mr. Gelsinger's statement, as well as the evidence discussed above, the Hearing Officer finds that Jeremy's disorder in attention is the processing disorder that *is the primary cause* of his specific learning disability.

\* \* \* \* \* \*

> The Hearing Officer finds that, while the evidence indicates that Jeremy may have a conduct disorder which results in some of his behavioral problems, Jeremy's disorder in attention is a substantial cause of his negative behaviors. This finding is supported by the testimony of Mr. Lappin and Dr. Baumgarten that many of Jeremy's negative behaviors stem from his attention-deficit disorder and his resultant school failure, depression, and feelings of inadequacy. It is also supported by Ms. Flockton's testimony that Jeremy has a fear of failure that results in his need for a great deal of teacher time and attention. Therefore, the Hearing Officer finds that Jeremy's social and emotional problems *are not segregable* from the learning process.

Hearing Officer Decision at 19–20.

In reviewing this decision, the district judge was not required to be certain that it was correct; a "preponderance of the evidence" is all that was required. 20 U.S.C. § 1415(e)(2). There was a preponderance of the evidence for the proposition that Jeremy's social maladjustment could not be separated out from his organic disorder, and that his misconduct was primarily caused by his organic disorder rather than a non-covered problem.

The Secretary of Education has resolved the problem of mixed causation. That is where the child's learning problems are caused partly by covered learning disabilities, and partly by non-covered matters such as willful bad behavior or non-"serious" "emotional disturbance." The child falls into the "specific learning disability" category unless the learning problems are "primarily the

result" of the non-covered causes. 34 C.F.R. § 300.7(b)(10). Because of this administrative decision, commingled causes such as in Jeremy's case are covered, where the hearing officer and district court properly determine on a preponderance of the evidence that the learning disabilities are not "primarily" the result of a non-covered cause.

So if, as the hearing officer found, Jeremy's learning disability was primarily caused by a covered disorder, he would not lose coverage simply because there existed a secondary cause that was not covered. Nor would the hearing officer or court be obliged to sort out percentages. Only if Jeremy's learning problems were "primarily" caused by non-covered causes would he lose coverage.

The district court properly took account of the United States Department of Education clarification of its policy regarding the education of children with attention deficit disorder. In a letter to all chief state school officers, Assistant Secretary of Education Robert Davila informed the schools that attention deficit disorder is to be treated for purposes of the Act as a specific learning disability. The agency here is entitled to deference in its interpretation of the statute, because the interpretation is based on a permissible construction of the existing statutory language. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Because we find that Jeremy was eligible to receive services under the terms of the Act, we must review the district court's determination that the school district's proposed placement was not appropriate.

Our dissenting colleague concludes that we, the district court, and the hearing officer have erred, because no evidence was introduced to show that Jeremy's school failure was caused by a covered disability rather than bad behavior which Jeremy could have controlled. As we read the record, we must disagree. Substantial evidence was presented on both sides, including the evidence summarized above, showing a physiological explanation for Jeremy's behavior. Although a reasonable fact finder might have reached a different conclusion, we read the record as showing that the hearing officer meticulously analyzed the evidence, considered causation, and concluded that Jeremy's failure was caused primarily by his covered disability.

The hearing officer specifically addressed the question of "what unique needs arise from Jeremy's handicapping condition" and concluded that "Jeremy's impulsivity is a hallmark symptom of attention-deficit disorder and he exhibits a lot of the negative characteristics, such as rebellion against authority, of a child whose attention-deficit disorder results in school failure." She also found that "Jeremy's disorder in attention is the processing disorder that is the primary cause of his specific learning disability."

The district court reviewed the record, considered additional evidence, and reasonably concluded that a preponderance of evidence compelled the conclusion reached by the hearing officer. As is explained above, we are to review the factual determinations for clear error, and the appropriateness of the educational program de novo, but giving "due weight" to the hearing officer's determination. Under those standards, affirmance is required on this record. We intimate no view of our own on the desirability of the level of services compelled by Congress for students whose school failure is attributable in part to their own misbehavior.

### 2. Jeremy's Needs

■ We find that a preponderance of the evidence also supported the hearing officer's and the district court's findings that the individualized education program developed by the school district did not meet Jeremy's needs. It would have moved him around too much between classes, assigned him to too many teachers, and would give him insufficient structure. As the hearing officer stated:

> School psychologist Gelsinger agreed that Jeremy needs frequent feedback and clear commands. OCMH therapist Lappin testified that Jeremy needs a structured school environment or else he will make poor choices and be unable to pay attention. Clinical psychologists Drs. Baumgarten

and Harrington also supported Jeremy's need for a structured school environment, in terms of a small class size, a small campus, as well as a lot of feedback and consistency.

\* \* \* \* \* \*

The District's proposed placement may result in Jeremy having from four to six different teachers (depending on whether he is placed with one, two, or three different resource specialists) and would not provide him with the level of structure, individualized attention, and consistent behavior management that he needs in order to benefit from his education.

Hearing Officer's Decision at 20–21.

The school district agreed that Jeremy needed consistency, but the individualized education program it developed would not give it to him.

### 3. Services That Meet the Goals

The hearing officer also concluded that the school district's program did not give Jeremy enough special education time to meet the educational goals the district agreed were appropriate:

> The District's proposed placement also fails to meet the third part of the *Rowley* test. The third part of the *Rowley* test requires that the instruction and services included in the District's proposed placement comport with the goals and objectives on Jeremy's [individualized education program]. The goals and objectives on Jeremy's June 1990 [individualized education program] were agreed to by both parties and address a total of seven study areas: math, written language, vocational, grapho-motor skills, study skills, social skills, and socio-emotional on-task behaviors. Mr. DeGeer testified that the number of social and emotional goals were extensive and that, even as a special day class teacher who would teach Jeremy for four periods, he would have to prioritize these goals in order to determine which ones should be addressed first. By contrast, the District's placement proposal of three periods of RSP would only provide Jeremy with three periods of special edu-

cation each day in which to work on all of these goals.

Hearing Officer Decision at 21.

As the district court found, a preponderance of the evidence supported this finding. Jeremy's own special education teacher conceded that the time was insufficient to achieve the educational goals which the school district agreed were appropriate for Jeremy. Mr. DeGeer said:

> Those are very good goals. They've been developed exactly the way they should be, in my opinion. And I think there's just too many for one particular teacher right now, to get those goals and make a plan. I think they need to be shortened—not shortened but prioritized on which ones are important to the parent, which ones are important to the school, and develop the plan for the social and emotional goals and objectives.

The Act says that a "free appropriate public education" must offer the student services that are "in conformity with the individualized education program...." 20 U.S.C. § 1401(a)(18)(D); *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. The evidence was substantially uncontradicted that the services in Jeremy's case would not conform to the goals stated in his individualized education program.

Because the school district's proposed placement did not satisfy the *Rowley* test and the requirements of the Act, we affirm the determination of the district court that it was not an appropriate placement. Normally that would end the matter, but in this case, the Wartenbergs are seeking reimbursement for unilaterally placing Jeremy at the Mardan Center during the pendency of this matter.

### 4. Placement at Mardan

■ The Supreme Court has held that parents may be reimbursed for costs incurred in placing a child in "private special education ... if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington School Comm. v. Massachusetts Dep't of Educ.,* 471 U.S. 359, 369, 105 S.Ct.

1996, 2002, 85 L.Ed.2d 385 (1985). The hearing officer made findings, which were properly upheld by the district court on a preponderance of the evidence standard, that Mardan met all three *Rowley* criteria and was an "appropriate" placement within the meaning of the Act.

The testimony of Mardan's Executive Director David Eisenman established that, at Mardan, Jeremy is in a class with the same teacher the entire day, one aide, and eleven other students, all of whom are within the same age range and ability level as Jeremy. According to Dr. Ernsdorf, there are actually two teachers for Jeremy's class—one main teacher and one assistant teacher. Although Dr. Ernsdorf testified that the District offers a greater variety of vocational programs than does Mardan, the testimony of Mr. Eisenman established that Jeremy's vocational goal of increasing his awareness of vocational opportunities could be met at Mardan. (Exhibit P–139) The Hearing Officer finds most compelling the fact that, as testified to by both Mr. Eisenman and Dr. Ernsdorf, a comprehensive behavior management plan is used with Jeremy at Mardan such that he receives consequences the same day that he either fails to do his homework or misbehaves. With regards to the third *Rowley* requirement, this approach comports with the goals and objectives of Jeremy's IEP in the area of study skills, social skills, and social-emotional on task behaviors.

The consistency of the behavior plan, as well as the small class size and high student-teacher ratio that Jeremy has at Mardan, also meets his unique needs for individualized attention and structure that result from his handicap. Jeremy's summer school grades show that he can benefit, and has benefitted, from his education at Mardan. (Exhibit P–158) Therefore, the Mardan placement meets the first *Rowley* requirement of a setting specially designed to meet Jeremy's unique needs and a setting that would permit him to benefit educationally. Although there was not a great deal of testimony with regards to the support services available at Mardan, Mr. Eisenman mentioned that group counseling is available to the students there as part of the regular programs. Therefore, given the finding above that Jeremy requires group counseling as a related service, the Hearing Officer finds that Mardan offers sufficient support services to permit him to benefit educationally. Because the program designed for Jeremy at Mardan meets all three of the *Rowley* requirements, the Hearing Officer finds that Mardan is an appropriate placement for Jeremy and that the District is responsible for funding his placement there.

Hearing Officer decision at 22–23.

So, at Mardan, Jeremy had a small class with a high teacher-student ratio, and immediate consequences when he misbehaved or did not do his work. And as the district judge noted in her findings, Jeremy did better academically after transferring to Mardan. Academic success is a helpful guidepost in determining the appropriateness of an educational setting in meeting a students unique needs. *See Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. A review of the record indicates that the district judge and the hearing officer were correct in finding that the Mardan Center provided an "appropriate" educational setting for Jeremy.

■ The school district and the amicus argue that the placement at Mardan gave insufficient weight to "mainstreaming." The statute requires that state procedures provide for mixing disabled children with others "to the maximum extent appropriate," and that separate education be used only when education in regular classes "cannot be achieved satisfactorily":

> [To qualify for assistance, a state shall establish] procedures to assure that, *to the maximum extent appropriate,* children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with

the use of supplementary aids and services *cannot be achieved satisfactorily.*

20 U.S.C. § 1412(5)(B) (emphasis added). To reach the result they did, the hearing officer and the district court had to consider the appropriateness of the school's individualized educational program, so a fortiori they determined that under that mainstreaming program, "education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

The evidence overwhelmingly supported this rejection of mainstreaming. Jeremy was placed in regular classes in the seventh grade and failed. When he started at Capistrano, he received minimal special attention and was included in regular ninth grade classes to the greatest extent possible. He failed every one. Then the school placed him in a special day class within the normal school setting. Still, he failed. As the district court found, when he began attending Mardan, with its increased attention and comprehensive behavior management plan, he succeeded. This result is consistent with the predictions of the doctors at College Hospital, who said Jeremy needed a very structured environment in order to benefit from his education. Congress expressed a preference for mainstreaming where "appropriate." Congress provided for separate teaching of disabled children where education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." Mainstreaming which results in total failure, where separate teaching would produce superior results, is not appropriate and satisfactory. Congress expressly limited its presumption in favor of mainstreaming to cases where mainstreaming is "appropriate" and mainstream education can be provided "satisfactorily."

The award of the costs of tuition for and transportation to Mardan was not in error.

## D. Attorneys' Fees

■ The school district argues that the district court erred in awarding attorneys' fees to the Wartenbergs, because they did not accomplish a more favorable result from the "due process hearing" than the school district was prepared to give them by way of settlement before the hearing. There is no factual support in the record for the school district's position, and we affirm.

The statute provides for an award of attorneys fees to parents if they prevail, so long as they did not turn down a "more favorable" settlement offer:

(D) No award of attorneys' fees and related costs may be made in any action or proceeding under this subsection for services performed subsequent to the time of a written offer of settlement to a parent or guardian, if—

(i) the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than ten days before the proceeding begins;

(ii) the offer is not accepted within ten days; and

(iii) the court or administrative officer finds that the relief finally obtained by the parents or guardian is not more favorable to the parents or guardian than the offer of settlement.

20 U.S.C. § 1415(e)(4)(D).

The school district's written settlement offer required that the Wartenbergs accept a different school farther from their house, give the school district a hold harmless agreement, and waive all attorneys fees.

They won a more favorable decision. Most importantly, they won a ruling that the Mardan placement was appropriate and Jeremy would not have to change to another school. The district court found that an award of attorneys' fees would be appropriate under these circumstances, and was not in error in so doing.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

I must dissent because the hearing officer, the district court and the majority are in error as a matter of law in concluding that a student's behavioral problems which are not caused by any specific learning disability can require the public school system to pay for private schooling.

The record in this case demonstrates that public schools are not required to assume responsibility for the volitional behavior of a student simply because that student qualifies for special education under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 *et seq.*

## BACKGROUND

Jeremy Wartenberg was a high school student who suffers from a mild, specific learning disability, a language processing problem. It is undisputed that Jeremy is eligible for special education and related services under IDEA based on his specific learning disability. 20 U.S.C. § 1401(a)(1)(A); 34 C.F.R. § 300.7(b)(10). Jeremy is also an adolescent whose conduct is marked by a distinct lack of conscience. Jeremy's defiant, hostile and antisocial behavior has been directed towards teachers and administrators at school, as well as towards his family at home.

Jeremy attended public schools in the Capistrano Unified School District ("Capistrano District") from kindergarten through ninth grade, when his parents unilaterally withdrew him from Capistrano Valley High School.[1] In seventh grade, Jeremy was temporarily removed from school by his parents and admitted to College Hospital in response to his extreme behavioral problems. Upon Jeremy's discharge from College Hospital, he returned to the eighth grade at Newhart Junior High School in the Capistrano District. He completed junior high at Newhart, under an Individualized Education Program composed of regular classes and one hour of special education per day.

In high school Jeremy's behavioral problems worsened. Additional Individualized Education Program assessment meetings were held and a new treatment plan was developed. Jeremy's Individualized Education Program included weekly individual therapy, collateral therapy for his parents, consultations with a behavior management specialist to establish a behavioral system integrating home and school, and weekly meetings between Jeremy's teachers and his parents. The school district conducted additional Individualized Education Program assessments throughout 1989 and 1990. The school district ultimately concluded that Jeremy's scholastic failures did not result from his specific learning disability, but rather were solely the result of his defiant and antisocial behavioral problems. Jeremy was eventually diagnosed as also having attention-deficit disorder and a conduct disorder.

In school, Jeremy threatened others with "I want to kill you" and defied teachers' commands with profanities. Jeremy's behavior at home was equally as terrifying. During his mother's pregnancy with a second child, Jeremy kicked her, hit her in the stomach, and stated that he wanted to kill the baby. Jeremy has set fires, lied and shoplifted. His mother was forced to leave the family home with her younger son for an extended period of time for fear of Jeremy injuring the baby.

Jeremy received passing grades and was an acceptable student when he attended class, did his homework, and was not truant. When Jeremy chose to be defiant and antisocial, his grades dropped. There is no evidence that the special education programs the school provided for Jeremy were an inadequate response to Jeremy's mild, specific learning disability. Jeremy's parents, however, were dissatisfied with members of the school district's Individualized Education Program assessment team and with Jeremy's persistent anti-social behavior. In response to their frustration, Jeremy's parents unilaterally placed Jeremy in a private school and sought reimbursement and attorneys' fees from the school district.

The majority has ruled that the public school system must pay for Jeremy's private education and his parents' attorneys' fees. I maintain that it does not.

## APPLICABLE LAW

The key to the error in this case is the deliberate and explicit rejection by the administrative hearing officer and the district court of the requirement of causation. The

---

1. For a portion of Jeremy's sixth and seventh grade years, his parents withdrew him from the Capistrano District and enrolled him in a private school known as the ITOP Center for Learning.

majority assert that the hearing officer "meticulously analyzed" the evidence and determined that Jeremy's failure was "caused primarily by his covered disability". However, the hearing officer made no such finding. The hearing officer concluded that:

> Jeremy's disorder in attention is the processing disorder that is the primary cause of his specific learning disability.

Finding that Jeremy's attention-deficit disorder causes his qualified learning disability is not, as the hearing officer, the district court, and the majority impute, the same as finding that Jeremy's learning disability causes his behavioral problems. The cause of Jeremy's qualified learning disability is immaterial to the resolution of this case. The question before the hearing officer and the district court was whether Jeremy's specific learning disability caused his behavioral problems and there was no evidence offered that it did.

This court's review of a state hearing officer's decision under IDEA involves a two-step analysis. First, the court must determine whether IDEA's procedural requirements have been met. Then, the court must establish whether IDEA's substantive component, requiring the state to provide an "appropriate" education from which a child can benefit, has been satisfied. *Union School Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994) (citations omitted). The state hearing officer erred in her analysis of the adequacy of Capistrano District's Individualized Education Program for Jeremy.

The hearing officer concluded that Capistrano District's Individualized Education Program for Jeremy was inadequate because Jeremy was not benefiting from his education. As a result, she found that Jeremy's parents are entitled to reimbursement for his private placement. However, the states need only provide qualified children with a "basic floor of opportunity" through a program "individually designed to provide educational benefit to the handicapped child." *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (9th Cir.1987) (quoting *Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 197 n. 21, 200–01, 102 S.Ct. 3034, 3046 n. 21, 3048, 73 L.Ed.2d 690 (1982)). The record is clear that Capistrano District designed a program from which Jeremy could have benefited, had he chosen to do so.

To qualify under IDEA, a child must satisfy three criteria: (i) he must suffer from one or more of the categories of impairments delineated in IDEA, (ii) his impairment must adversely affect his educational performance, and (iii) his qualified impairment must require special education and related services. Dennis E. Cichon, *Responsibility Under the Education For All Handicapped Children Act of 1975*, 48 Ohio St.L.J. 1089, 1112 (1987). If a school district fails to provide free appropriate education from which a qualified child can benefit, a parent has an equitable right to reimbursement for a private educational placement. *W.G. v. Board of Trustees*, 960 F.2d 1479, 1485 (9th Cir.1992) (citing *Burlington School Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)). However, a nexus must exist between the qualified impairment and the necessity of a private placement.

## DISCUSSION

The statutory language of 20 U.S.C. § 1401(a)(1)(A)(ii) establishes a causation requirement for receipt of benefits under IDEA:

> (a)(1)(A) The term "children with disabilities" means children—(ii) who, *by reason thereof,* need special education and related services. (Emphasis added.)

Absent such a causation requirement, school districts could be forced to pay for special education and related services, including private placements, for emotionally disturbed students whose inability to benefit from education does not result from any qualified disability, but rather results from problems at home such as physical abuse or the emotional trauma that often accompanies divorce. Here, the school district agrees that Jeremy qualifies for special education because of his specific learning disability. However, the school district contends that Jeremy's behavioral problems which inhibit his learning are caused by his diagnosed conduct disorder and not by his specific learning disability.

The hearing officer, the district court and the majority err in their analysis of Jeremy's need for a private placement in two ways. First, they rely on the hearing officer's wrong conclusion that causation is not the legal test for determining whether a private placement is required under IDEA. Secondly, they confuse Jeremy's specific learning disability with his diagnosed attention-deficit disorder and ignore his diagnosed conduct disorder. Neither the state hearing officer nor the district court found that Jeremy's qualified specific learning disability significantly affected his behavioral conduct at home or at school.

It is clear that the analysis of behavioral causation must be the starting point for determining the responsibilities of public schools under IDEA. If causation were not required, then every impediment to learning, regardless of whether or not it was a learning disability, could qualify a student for a private placement. Yet, the hearing officer held:

> Much of the testimony in the hearing addressed whether Jeremy suffers from an attention-deficit disorder and whether this disorder in fact causes his emotional and behavioral problems. It should be noted, however, that the standard the courts use *does not make causation* part of the analysis but instead focuses on the ability to segregate a student's medical, social or emotional problems from the learning process. (Emphasis added.)

While segregability may be a subsequent question which must be addressed in residential placement cases, *see Clovis Unified School Dist. v. Office of Administrative Hearings*, 903 F.2d 635, 643 (9th Cir.1990), *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693 (3rd Cir.1981), it is not the test for evaluating volitional behavior.

This court, in *Doe v. Maher*, 793 F.2d 1470 (9th Cir.1986), *aff'd sub nom., Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (holding that a handicapped child may be expelled if his misbehavior is not a manifestation of his handicap), applied a causation test when considering whether student misconduct, unrelated to a qualified impairment, is protected under IDEA. *Maher*, 793 F.2d at 1482. Expulsion cases like *Maher* directly address whether a handicapped child's misbehavior can result from factors outside of his handicapping condition. Like expulsion, private placement may be necessary to address a child's behavioral problems, but may not be covered by IDEA. The school district is not responsible for a child whose learning disability is not the cause of his educational failure.

Jeremy had the ability to control his behavior. It is true that you cannot differentiate Jeremy's conduct from the fact that he was not learning. Jeremy's behavioral problems caused his failure to learn. However, the hearing officer explicitly ignored the fact that Jeremy can only qualify for a private placement if his qualifying learning disability caused his behavioral problems. It is not the government's responsibility to intercede every time a parent abdicates his or her parenting responsibilities. IDEA does not require the school district to assume the cost for such deliberate behavior. Jeremy's specific learning disability, a language processing problem, does not justify private schooling at the expense of the school district.

The hearing officer, district court and majority also confuse Jeremy's diagnosed attention-deficit disorder with his specific learning disability. They assert that Jeremy's attention-deficit disorder, as the probable cause of his specific learning disability, qualify him for a private placement. The record demonstrates that, in addition to his specific learning disability, Jeremy also has attention-deficit disorder. The *Diagnostic and Statistical Manual III–R* ("the *Manual* "), upon which all parties rely, defines attention-deficit disorder as a condition persisting for at least six months in which a child fidgets, cannot remain seated, blurts out answers, shifts from one uncompleted activity to another, or cannot play quietly. Jeremy's parents did not place him in a private school because he exhibited such traits. Moreover, the programs specifically designed for Jeremy at the public school were comprehensive and adequate to handle such a problem. While attention-deficit disorder, like a specific learning disability, is an organic disorder, there is

no basis in reason or law to justify it resulting in a private placement.

Jeremy also has a conduct disorder. The *Manual* enumerates some of the symptoms indicative of a conduct disorder as stealing, running away from home overnight, lying, fire-setting, truancy, and physical cruelty. These were the behavioral problems which led Jeremy's parents to put him in a private school. The evidence is clear that Jeremy's behavioral problems resulted from his conduct disorder and not his attention-deficit disorder. When he wanted to control his behavior, he succeeded in school; when he chose not to control his behavior, he failed.

The hearing officer, in her findings of fact and conclusions of law, rejects the requirement of causation with respect to Jeremy's specific learning disability. Yet in her discussion of attention-deficit disorder, the hearing officer specifically relies on it. She states:

> Much of the testimony in the hearing addressed whether Jeremy suffers from an attention-deficit disorder and whether this disorder in fact causes his emotional and behavioral problems ... The Hearing Officer therefore finds that Jeremy does suffer from an attention-deficit disorder.

> [W]hile the evidence indicates that Jeremy may have a conduct disorder which results in some of his behavioral problems, *Jeremy's disorder in attention is a substantial cause* of his negative behaviors. (Emphasis added.)

The hearing officer finds that Jeremy's misbehavior was not caused by his specific learning disability, but was substantially caused by his attention-deficit disorder. She concludes that because attention-deficit disorder "can" be part of a specific learning disability, Jeremy qualifies for private placement. The latter is subject to being clearly erroneous. There is no evidence that Jeremy's misbehavior at home or his threats to kill people at school were substantially caused by his lack of attention. Jeremy's behavioral problems which resulted in his private placement are manifestations of his conduct disorder and his conduct disorder does not qualify him for benefits under IDEA.

Even if one accepts the hearing officer's conclusions as supported by the evidence as a matter of law, a diagnosis of attention-deficit disorder does not qualify a child for protection under IDEA.

While Jeremy's attention-deficit disorder may be an "organic disorder" and may be the cause of his behavioral problems, mere diagnosis of attention-deficit disorder does not qualify a child for protection under IDEA. *See* 20 U.S.C. § 1401(a)(1)(A); 34 C.F.R. § 300.7; *Camden (MO) R–III Sch. Dist.,* 20 IDELR 197 (1993) (implying that only the American's with Disabilities Act and § 504 of the Rehabilitation Act are violated by not evaluating a student for attention-deficit disorder). Both the hearing officer and the district court rely on a letter promulgated by the Department of Education in 1991 to conclude that Jeremy's attention-deficit disorder is sufficient to qualify Jeremy for protection. The explanatory letter, however, does not purport to establish attention-deficit disorder as a qualifying disability. In fact, the letter states that Congress explicitly decided *not* to include attention-deficit disorder as a qualified impairment in the 1990 amendments to IDEA. The Department of Education letter clarifies that a child diagnosed with attention-deficit disorder or attention-deficit hyperactive disorder *may* qualify as handicapped under IDEA only if their attention-deficit disorder or attention-deficit hyperactive disorder is so severe that it qualifies as a specific learning disability. (Letter from U.S. Dep't of Educ. to Chief State School Officers of 9/16/91, at 1–4.) Jeremy was never so assessed. It is undisputed that Jeremy qualified for IDEA only on the basis of his language processing problem. It is also undisputed that Jeremy's language processing problem did not cause his behavioral problems.

The hearing officer, the district court and the majority apply the wrong test to determine whether or not Jeremy's education in the Capistrano District was adequate under IDEA. Jeremy is entitled to receive free appropriate public education from which he can derive educational benefit. *Gregory K.,* 811 F.2d at 1314; *Rowley,* 458 U.S. at 201, 102 S.Ct. at 3048. Jeremy's scholastic fail-

ure, however, was the direct result of volitional behavior. School districts bear the responsibility of educating disabled students; they do not bear the responsibility of parenting anti-social students.

I therefore dissent.