**PARENTS OF STUDENT W, individually and as Guardians Student W, a minor, Plaintiffs–Appellants,**

v.

**PUYALLUP SCHOOL DISTRICT, NO. 3, Defendant–Appellee.**

No. 93–35071.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1994.

Decided Aug. 17, 1994.

Charles D. Williams, Silverdale, WA, for plaintiffs-appellants.

William A. Coats, Joni R. Kerr, Vandeberg & Johnson, Tacoma, WA, for defendant-appellee.

Before: POOLE, BRUNETTI and KLEINFELD, Circuit Judges.

POOLE, Circuit Judge:

The parents of an emotionally and learning disabled student, referred to as "Student W.," appeal from summary judgment for defendant Puyallup School District, No. 3 (hereinafter "District") and a denial of their request for attorney's fees. The parents brought suit under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, after their claims were dismissed by an administrative law judge. They seek an injunction prohibiting the District from imposing its Special Education Suspension Guidelines (hereinafter "Guidelines"), an award of one and one-half years of compensatory education to make up for past failures to provide special education, and attorney's fees as the prevailing party below. We reject their claims and affirm.

## I.

On September 15, 1988, when Student W. was beginning seventh grade in the Puyallup School District, he was assessed for disabilities at the request of his parents. It was determined that he was learning disabled in math. In the 1988–89 school year, Student W. was enrolled in special education math at Kalles Junior High, and received behavior specialist services. He frequently had behavioral problems.

In March of 1989, Student W. was transferred to Ferrucci Junior High, also within Puyallup District, but remained there only a short time, as his behavioral problems continued. He was transferred back to Kalles, but educated in the resource room only.

Prior to the start of Student W.'s eighth grade year (1989–90), his family moved out of Puyallup School District, and into the Fife School District. However, the two districts agreed to allow Student W. to attend Edgemont Junior High in Puyallup District, since his family was planning to move back into the Puyallup District shortly. The school counsellor offered special education math, which Student W. and his mother declined. Student W. received no special education.

In late October 1989, the Puyallup District rescinded its agreement to allow Student W. into Edgemont due to his behavior problems. He was then enrolled at Surprise Lake Middle School in the Fife School District until the end of January, 1990. His parents then moved back into Puyallup, and enrolled Student W. at Edgemont. The school counsellor again offered a behavior specialist. Student W. declined the offered services. At that time, Student W. was fifteen years old. Student W.'s extreme behavior problems continued, and that spring he was suspended from April 13th until the end of the school year, June 14th, a loss of forty-five school days.

Student W. again switched districts for his ninth grade year (1990–91), beginning the year at Fife High School in the Fife School District. Again, his behavior was a problem, and in October, 1990, Fife rescinded its authorization for the transfer. Student W.'s mother attempted to enroll him in the Puyallup School District's alternative school (which does not take students who have been suspended). After a twenty-seven day delay during which Student W. did not attend school, his parents enrolled him again in Edgemont.

At no time during any of these transfers did Student W.'s parents request an assessment or special education classes.

On February 21, 1991, Student W. was suspended for thirteen days, and served three days before the balance was lifted after his attorney appealed. On February 25, 1991, Student W. was again suspended for the balance of the school year.

During the month of February, 1991, the parents of Student W. contacted an attorney and learned their son was still eligible for

special education. On his advice, Mrs. W. requested a reassessment on March 1, 1991, and the implementation of the January 4, 1989 Individualized Education Program ("IEP") until the time of the reassessment. The W.'s attorney, by letter dated March 20, 1991, requested a due process hearing based on the following:

1. The District made a change of placement without proper notice to parents.

2. The District failed to properly identify the student's educational handicap as per the District assessment.

3. The District failed to make an annual review of placement of the student's progress as per his individual education program.

4. The District failed to initiate a reassessment of the student's placement and eligibility when facts warranted such intervention.

Student W.'s long-term suspension was lifted. On March 28, 1991, he was suspended for five days, and on April 15 for four days, although he only served three. Student W. was thus suspended a total of eleven days in the spring of 1991.

On March 25, 1991, the plaintiffs informed the District that Student W. had been diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD").

On April 17, 1991 a multi-disciplinary team ("MDT") and the District's Director of Special Services determined that Student W. was eligible for special education, and recommended a self-contained classroom and counselling. They also determined that there was no need for extended school year programming.

At the first IEP meeting on April 22, 1991, the parties agreed to a temporary IEP, pursuant to which Student W. spent half the day at Ferrucci Junior High and half the day at STARS, a special District program. Student W. completed the 1990–91 school year with that schedule.

At a second IEP meeting on May 31, 1991, the District proposed retaining the Ferrucci/STARS placement. Student W.'s parents had objections and refused to sign the IEP. Mrs. W. explained that she objected to the proposed October 15, 1991 review date, and wanted an earlier date to plan for Student W.'s anticipated behavior problems at Puyallup High.

The administrative hearing requested by the parents was held on June 5th and 26th, 1991. By the first hearing date, the parties agreed that Student W. would enroll at Puyallup High School for the 1991–92 school year. The District had also agreed to meet with the parents and Student W.'s treating psychiatrist before the start of the school year to develop a disciplinary plan.

During the second day of the hearing, the District moved to dismiss based on failure to state a claim. In their opposition brief, the plaintiffs listed eight types of relief which they were seeking.[1] The administrative law judge determined that he lacked the authority to grant the requested relief, and dismissed the appeal, adding:

This order is based upon the understanding that the district shall convene an IEP meeting to develop the student's program for the 1991–92 school year prior to the beginning of this school year.

The parties did meet and develop a new IEP before the start of the 1991–92 school year. However, the parents filed suit in district court on August 15, 1991, seeking an injunction precluding the imposition of the District's Suspension Guidelines[2] on Student

---

1. Plaintiffs sought an order requiring the District to (1) cease suspending Student W. for behavior associated with his handicap, (2) seek "judicial relief" within twenty-four hours of suspending Student W. for any reason, (3) retain Student W.'s psychiatrist, Dr. Reiter, and follow his advise, (4) let Dr. Reiter have final approval over any decisions regarding Student W.'s program and placement, (5) retain Dr. Reiter to monitor Student W. and to follow his recommendations as to necessary alternative placements immedi-

ately, (6) retain an outside educational expert to develop IEP goals, (7) provide counselling to the parents and (8) provide compensatory education as needed to allow Student W. to complete high school.

2. *Special Education Suspension Guidelines*

1. You must have an MDT on EVERY suspension, be it a short or long term suspension, explusion [sic], or emergency explusion [sic].

W., and an award of one and one-half years of compensatory education. Mrs. W. "signed [the IEP] only so that Travis can enter Puyallup High School 9–4–91, pending litigation of the issues before the Court." The plan was implemented throughout the school year with minor modifications, including Student W.'s transfer into regular math, with his parents' approval. During the 1991–92 school year, Student W. was given in-school suspension for three days beginning March 2, 1992, and a five day suspension beginning May 4, 1992, of which three days were served in school.

The parents declined summer school for Student W. for the 1991 and 1992 summers.

The District moved for summary judgment on the issues of compensatory education and suspension guidelines, and the district court filed an order granting the motion and denying attorney's fees to plaintiffs on December 14, 1992.

Plaintiffs timely appealed from the December 14, 1992 order.

We were informed at oral argument that Student W. had recently been graduated from high school with his class.

## II.

 The district court granted the District's motion for summary judgment, holding that the suspension guidelines were not unlawful as written, and Student W. was not entitled to an award of compensatory education. We review an award of summary judgment *de novo*. *Jones v. Union Pacific R.R.*, 968 F.2d 937, 940 (9th Cir.1992). The parents did not raise material issues of fact either in their briefs or at oral argument, and

thus our review turns on the application of the law. Like the district court, we must review the administrative proceeding with some deference, as explained by the First Circuit and affirmed by the Supreme Court in *Town of Burlington v. Department of Education*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985):

> The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

(quoted in *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir.1987)).

### A.

The District argues that we should not reach the question of the requested injunctive relief from application of the Guidelines because the parents failed to preserve it for judicial review. We find, however, that the parents raised their request at the administrative level.

The parents asked the hearing officer to order the District to cease suspending Student W. for behavior related to his condition, and to seek judicial relief within twenty-four hours of his suspension for any reason. Such an order would effectively preclude the application of the Guidelines against Student W., since the Guidelines allow short term suspensions, and do not require recourse to the courts. While the parents formulated their claim differently in the district court than they did at the administrative hearing, this

2. It is advisable to have the MDT BEFORE you send the student home, but definitely within two (2) school business days.

3. You CANNOT long term a special education student from their special education program.

4. There is a 15 day maximum limit on accumulation of short term suspensions per semester. Every short term suspension must have it [sic] own MDT.

5. You must go through the process, involve the MDT team, complete required forms on long and short term suspensions or longer and send a copy to the PPS office for student file.... Long term suspensions or longer

must have special education administration approval....

6. Do not manipulate or coerce the parent(s) into agreeing to withdraw their child or signing a release from special education.

The accompanying Special Education Short Term Suspension Form requires the following information: current problem, past problems with dates and action taken, whether the current problem is "part of the handicapping condition," whether the current problems is "the result of an inappropriate program," whether "the cumulative effect of all short term suspensions adversely affected the students [sic] program," and a recommendation by the MDT.

slight discrepancy should not preclude them from seeking relief from the application of the Guidelines, especially since the District waited until the hearing itself to reveal that the Guidelines existed. We therefore reach the issue of lawfulness of the Guidelines.

The parents of Student W. argue that suspensions totalling more than ten days in a school year constitute a "change in placement," which must be undertaken only within the protective framework of the IDEA. This argument is based on *Honig v. Doe*, 484 U.S. 305, 325, 325–26 n.8, 108 S.Ct. 592, 605, 605 n.8, 98 L.Ed.2d 686 (1987). However, the parents misread *Honig*.

 A suspension may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the consent of the parents, or after written notice, and the opportunity for a hearing. However, not all suspensions constitute a prohibited "change in placement." "[W]here a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for up to 10 schooldays." *Id.* at 325, 108 S.Ct. at 605. The Supreme Court adopted the ten-day limit from the Office of Civil Rights ("OCR") of the Department of Education, which decided that "a suspension of up to 10 schooldays does not amount to a 'change in placement.'" *Id.* at 325 n. 8, 108 S.Ct. at 605 n. 8. Based on this cut-off, the Court found that suspensions of twenty and thirty days' duration were impermissible. *Id.*

However, the Supreme Court made no finding about the total number of short-term suspensions per semester or per year which were permissible. Plaintiffs attempt to read the 10–day durational limit as a 10–day total limit, but *Honig* simply does not support their argument.

*Honig* does support reference to OCR policy when considering how "change in placement" applies to suspensions. *Id.* The parents offer a November 18, 1992 letter from the OCR to the Akron, Ohio School District as further support of their position that the Puyallup District may not suspend its disabled students more than 10 days total in one school year. However, the parents attempt to read more into the letter than is there.

> [A]ccording to OCR policy, a series of suspensions that, in the aggregate, exceed 10 days during the school year *can* create a pattern of exclusion that constitutes a significant change in placement.

 Akron (OH) City School Dist., OCR Letter, 19 IDELR 542 (Nov. 18, 1992) (emphasis added). Even assuming this letter states OCR policy, the OCR has not adopted a bright line test.[3] Suspensions exceeding ten days can create a change in placement, but do not necessarily do so. The OCR concluded that the Akron discipline policy which allowed for suspensions up to ten days per semester (twenty days per year) without considering whether a change in placement was created was in violation of 34 C.F.R. § 104.35.[4] The solution agreed to by the OCR was *not* a total ban on suspensions of disabled students, as requested by the parents in this case, or even a ban of suspensions totalling more than ten days per year. Instead, the Akron District agreed to implement procedures such that whenever suspensions totalled more than ten days in a year, it would "consider whether the exclusion constitutes a significant change in placement." *Id.* at 544. If, and only if, such a change has occurred, then "it will determine whether the student's misconduct is caused by the student's handicapping condition and, if so, whether the student's current educational program and placement is appropriate." *Id.*

 The Guidelines promulgated by Puyallup more than satisfy the requirements of the OCR to monitor for a change in placement. There is a limit on fifteen days of suspension per semester. But unlike the disapproved Akron policy, the District's

---

3. We note that the Akron letter is not a Policy Letter, like that relied upon by the Supreme Court in *Honig*, 484 U.S. at 325 n. 8, 108 S.Ct. at 605 n. 8, but merely a private letter resolving a particular complaint. It therefore does not command the same degree of deference.

4. 34 C.F.R. § 104.35(a) reads in relevant part: [A district] shall conduct an evaluation ... of any person who, because of handicap, needs ... special education or related services before taking any action with respect to ... any subsequent significant change in placement.

Guidelines do not allow the school to reach this limit thoughtlessly. Each suspension triggers a meeting of the multi-disciplinary team assigned to the pupil. According to the Guidelines, for a short term suspension, the MDT must decide whether "the current problem [is] part of the handicapping condition," whether "the current problem [is] the result of an inappropriate program," and whether "the cumulative effect of all short term suspensions [has] adversely affected the students [sic] program." These checks are more stringent than those which the OCR approved in the revised Akron policy. Were Student W. to be subject to this policy, each suspension would trigger an evaluation of whether he was continuing to receive the "appropriate public education" to which he is entitled. Thus, the Guidelines are lawful on their face. Although the District provides for the possibility of thirty days of suspension per year, unless and until the Guidelines are applied to Student W., and the District allows a "pattern of exclusion that constitutes a significant change in placement" to develop, there is no basis for this court to determine that they will be improperly applied.

The district court properly granted summary judgment to the District on this issue. Plaintiffs have raised no material issues of fact, and as a matter of law, since the Guidelines are lawful, plaintiffs are not entitled to an injunction against the application of the Guidelines.

### B.

■ The District argues that the parents have also failed to preserve the issue of compensatory education for review. The District agrees that at the administrative hearing, the parents sought compensatory education as needed to allow Student W. to complete high school with his peers. In their complaint in district court, parents alleged that Student W. had been deprived of one and one-half years of services and requested "such additional services as are necessary to remedy any loss of educational opportunity." In this court, plaintiff seeks one and one-half years of compensatory education. The District argues, without supporting authority, that since the parents sought more compensatory education in the courts than they did at the administrative hearing, that they have not preserved the issue. The parents' failure to specify a number of days of compensatory education requested at the hearing was the result in part in the hearing officer's refusal to allow the parents to present evidence regarding Student W.'s past suspensions, which are the basis for the one and one-half year request. We find that the parents did preserve this issue, and address whether the district court properly granted summary judgement to the District on this issue.

There is no question that the district court had the power to order compensatory education. What is less clear is whether it correctly determined that compensatory education was not appropriate in this case.

■ The district court has the power to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(e)(2). "[E]quitable considerations are relevant in fashioning relief." *School Comm. of Burlington v. Department of Education*, 471 U.S. 359, 374, 105 S.Ct. 1996, 2005, 85 L.Ed.2d 385 (1985). "The conduct of both parties must be reviewed to determine whether relief is appropriate." *W.G. v. Board of Trustees of Target Range School Dist.*, 960 F.2d 1479, 1486 (9th Cir.1992). The district court exercised its discretion in denying this equitable remedy, and this court reviews for abuse of that discretion. *See Lester H. v. Gilhool*, 916 F.2d 865, 872 (3rd Cir.1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

A brief review of the relevant facts is helpful. The District has admitted that Student W. was eligible for special education. After Student W. received such services in the 1988–89 school year, his mother refused special services in the fall of 1989, and then Student W. transferred out of the District. When Student W. returned to the District in January, 1990, the District allowed Student W. to decline special services without contacting his parents, and he received no special education until mid-April, 1991. During this time, he was suspended frequently.

■ The District violated the implementing regulations of the IDEA by terminating

Student W.'s special services without written notice to his parents. *See* 34 C.F.R. § 300.-504. The District argues that after Student W. transferred out of the District and back in, it simply lost track of his disabled status. However, pursuant to 34 C.F.R. § 300.220, it is the District's obligation to identify and locate schoolchildren in need of special services. The failure of the parents of Student W. to come to the District and request special services or further evaluation does not excuse the District's failure to maintain records on Student W. If Student W. had not been illegally allowed to remove himself from special education in January 1990, the District probably would have done a better job keeping track of him.

Once the District became aware (again) of Student W.'s special needs, it agreed to consider tutoring and summer school at public expense, as it must in the required annual formulation of his IEP, in order to ensure that Student W. was able to graduate with his class. Indeed, Student W. received tutoring in the spring of 1991. The record indicates that, aside from math, Student W. was performing at grade level and was on track to graduate with his class even without attending summer school. His multi-disciplinary team, however, recommended against extended school year services for Student W., since keeping him enrolled in the normal amount of classes had been difficult. As mentioned in Part I., Student W. successfully graduated from high school with his class this spring.

The behavior of Student W.'s parents is also relevant in fashioning equitable relief. *See Target Range,* 960 F.2d at 1486. His mother declined special education for her son in 1989, and when transferring him back into the District, never again asked for special services. More importantly, after Student W. was reassessed and found to be disabled, his parents twice declined to take advantage of summer school which might have helped Student W. regain his grade level in math.

▮ Student W. unquestionably lost time during his eighth and ninth grade years when he was not receiving special services. The plaintiffs argue that *ipso facto,* he is entitled to an equal amount of compensatory

education, without any further analysis. But compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting "appropriate relief." There was no showing that a general award of unspecified one and one-half years of compensatory education was appropriate.

▮ As the parents note, there are cases in other circuits in which courts have rotely awarded a block of compensatory education equal to time lost while a school district denied a free, appropriate public education to a handicapped child. *See, e.g., Valerie J. v. Derry Cooperative School District,* 771 F.Supp. 483 (D.N.H.1991); *Burr by Burr v. Ambach,* 863 F.2d 1071 (2nd Cir.1988), *vacated and remanded,* 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560, *reaff'd on recons.,* 888 F.2d 258 (1989) (awarding one and one-half years of compensatory education to student who was unable to attend school at all due to state errors and procedural delays). These cases do not contradict a court's power, when considering an equitable remedy, to apply a fact-specific analysis, as the district court did here, and decide that a generalized award of compensatory education is not appropriate. There is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA. Student W. was able to graduate from high school, before reaching age 21, without more services than provided for in his annual IEP. The IDEA promises him no more. Further, there was evidence that compensation in the form of extra tutoring and summer school was refused by the parents and might not be the best solution for Student W. To hold that the district court abused its discretion in denying compensatory relief would be to destroy the equitable nature of the district court's charge to fashion "appropriate relief." It may be a rare case when compensatory education is not appropriate, but it was not an abuse of the district court's discretion to decide that this case was such a rarity.

### III.

▮ As well as granting summary judgment to the District on the issues discussed

above, the district court considered and rejected the parents' request for attorneys' fees. The parents argued that they had succeeded in creating a change in the parties' legal position through the order of the administrative hearing officer, and were entitled to fees as the prevailing party pursuant to 20 U.S.C. § 1415(e)(4)(B). When reviewing the refusal to grant fees, we determine *de novo* whether the district court applied the correct legal standard. *Price v. Seydel*, 961 F.2d 1470, 1475 (9th Cir.1992).

The IDEA provides that:

> In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is a prevailing party.

20 U.S.C. § 1415(e)(4)(B). A prevailing party for the purpose of awarding attorney's fees is a party which "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) (citation omitted). Such success results in a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n v. Garland Independent School District*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989). "Where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimis*," the plaintiff cannot claim fees as a prevailing party. *Id.* at 792, 109 S.Ct. at 1493–94. There must be a causal link between the litigation brought and the outcome gained. *See Johnson v. Bismark Public School Dist.*, 949 F.2d 1000, 1003 (9th Cir.1991); *Robinson v. Ariyoshi*, 933 F.2d 781, 783 (9th Cir.1991); *Wheeler by Wheeler v. Towanda Area School Dist.*, 950 F.2d 128, 131 (3rd Cir.1991).

The administrative officer dismissed the parents' complaint in full. None of the eight types of relief requested were granted. The parents base their claim to be the prevailing party on the officer's acceptance of their argument that an IEP for Student W. must be established before the start of the 1992 school year, not in October as the District had proposed. As quoted in Part I., the relevant part of the hearing officer's order reads:

> This Order is based upon the understanding that the district shall convene an IEP meeting to develop the student's program for the 1991–92 school year prior to the beginning of this school year.

This "understanding" was just that, an understanding reached by the parties before the hearing officer issued his order. The parents argue that since the District had been suggesting a IEP meeting on October 15, this portion of the order changed the legal position of the parties, by memorializing the change in position. If the order did change the position of the parties, it did so in only the slightest fashion, entitling parents to an IEP meeting 6–8 weeks earlier, but guaranteeing no particular outcome of the meeting, while rejecting all of plaintiffs' demands for relief. The timing of the meeting was incidental to plaintiffs' claims about suspensions, and their demands that the District use their private psychiatrist to create, implement, monitor and modify Student W.'s program. It is completely unrelated to their claims for an outside expert, parental counselling, and compensatory education. This *de minimis* change was achieved before the hearing officer issued his order, not a result of that order. The causal link is missing.

The district court properly denied attorneys' fees to the parents. They were not the prevailing parties in any more than a *de minimis* sense.

## IV.

Because the district court correctly granted summary judgment to the District on the claims for injunctive relief and for compensatory education, and because the district court properly denied the request for attorney's fees, we

**AFFIRM.**