**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH PARK, by and through his
Guardian ad Litem, Kyung Hee
Park; KYUNG HEE PARK,
        *Plaintiffs-Appellants,*

        v.

ANAHEIM UNION HIGH SCHOOL
DISTRICT; GREATER ANAHEIM
SELPA,

        *Defendants-Appellees.*

No. 04-55569

D.C. No.
CV-03-02222-DSF

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
December 7, 2005—Pasadena, California

Filed April 17, 2006

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Beezer;
Partial Concurrence and Partial Dissent by Judge Wardlaw

4221

## COUNSEL

Benjamin Y. Kim, Torrance, California, for the plaintiffs-appellants.

Jonathan J. Mott, Parker & Covert LLP, Tustin, California, for the defendants-appellees.

## OPINION

BEEZER, Circuit Judge:

Joseph Park ("Joseph") and his mother, Kyung Hee Park, bring this action against the Anaheim Union High School District ("District") and the Greater Anaheim Special Education Local Plan Area. The complaint alleges that defendants have failed to comply with procedural and substantive requirements of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq.[1] The Parks expressly challenge the award of compensatory services and the denial of attorney's fees. The district court affirmed the decisions of the Hearing Officer of the California Special Education Hearing Office in part and modified minor details in part.

---

[1]All references and citations to the Individuals with Disabilities Education Act refer to the statute as in force at the time period in dispute (2001-2002).

We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

# I

Joseph was born in 1990 with a genetic defect known as cri du chat, cry of the cat, or 5p-syndrome. Deficits attributed to his disability include developmental delay, deficient cognitive ability, poor muscle tone, speech and language delay, gross and fine motor delay, difficulty in muscle training and coordination, difficulty assimilating toilet training, self-care difficulty, drooling and behavioral difficulties. Joseph has below average cognitive ability; his I.Q. is below 70. His family's primary language is Korean.

Joseph entered the Greater Anaheim public school district as a special day class student at age three. He attended Salk Elementary School within the Magnolia Elementary School District. A satisfactory individualized education plan was adopted and implemented for him. The Magnolia District annually reviewed the individualized education plan.

In March 2002, the Magnolia District conducted a triennial review. Members of the Anaheim District participated to facilitate Joseph's anticipated transition at the end of the school year. An audiology assessment was scheduled during this review. An audiologist administered a HEAR Kit test as part of the assessment. The audiologist could not reconcile inconsistent results because of a buildup of cerumen (earwax) in the subject's ear canal. The district informed Joseph's mother that it was her obligation to remove the cerumen or have it removed by a medical professional before the assessment could be completed. The cerumen was not removed and the assessment was never completed.

A special education consultant, qualified to administer certain vision tests, conducted a vision assessment and found that Joseph's vision was not hindering his education. The Parks

believe that Joseph is afflicted with double vision and optic nerve damage which the assessment failed to identify.

Based in part on the completed assessments, the Anaheim District and Special Education Local Plan Area recommended that Joseph be placed in a special education school for the 2001-2002 extended school year and the 2002-2003 school year. Joseph's parents contested the recommended placement and had Joseph attend a summer camp during the 2001-2002 extended school year. Joseph's mother requested new psychological, occupational therapy, physical therapy and speech and language assessments. The requested assessments took place over the summer and during the fall. There were no further attempts to administer the audiology and vision assessments.

In June 2002, the Parks requested a due process hearing naming Magnolia and Anaheim Districts as respondents.[2] Joseph attended a special day class at Lexington Junior High School pursuant to a confidential mediated interim agreement. Joseph's mother, along with her attorney and a translator, participated in October and November meetings to develop an individualized education plan, which the Anaheim District implemented in November 2002. The District conducted a functional behavior assessment and then created a proposed behavior intervention plan that it presented at a November individualized education plan meeting. The behavior intervention plan was not implemented because Joseph's mother contested the program's suitability.

A Hearing Officer of the California Special Education Hearing Office conducted a full hearing with both sides presenting witnesses and evidence. The Hearing Officer found: (1) the District conducted appropriate assessments and tested Joseph in all areas of suspected disability, (2) Joseph was denied a free and appropriate public education for the 2001-

---

[2]Appellants later settled with the Magnolia District.

2002 extended school year because the District failed to establish that it made a clear written offer of placement at the Hope School for that period, (3) Joseph was denied a free and appropriate public education from the first week of September through November 6, 2002 because the individualized education plan had not been implemented, (4) the proposed individualized education plan, in place as of November 6, 2002, was appropriate but the District needed to add self-help goals for buttoning, zipping and toilet training, (5) the District must provide compensatory education services to Joseph's teachers for Joseph's benefit and (6) the District prevailed on every issue but provision of a free and appropriate public education for extended school year 2001-2002 and September through November 2002 and compensatory services. The parties are in agreement on other issues.

Appellants brought suit in district court. The parties filed cross-motions for summary judgment and after a hearing the court entered final judgment. Appellants now challenge the following district court determinations: (1) Joseph was not prejudiced by any of the alleged violations of the Individuals with Disabilities Education Act's procedural safeguards, (2) the individualized education plan implemented in November 2002 does not deny Joseph a free and appropriate public education, (3) compensatory education services were properly awarded directly to the school teachers and (4) the District is not required to pay attorney's fees to Appellants for the costs of the due process hearing.

## II

The Individuals with Disabilities Education Act is satisfied if the State complies with the Act's procedures and an "individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits[.]" *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001)

(quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)).

We accord the Hearing Officer's determinations due weight because they were thorough and careful: the hearing lasted over eight days, the Hearing Officer was engaged in the hearing and questioned the witnesses to ensure the record contained complete information and that he understood the testimony. The decision entered by the Hearing Officer contains a complete factual background as well as a discrete analysis supporting the ultimate conclusions. *See Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996).

## A

**[1]** Individuals with Disabilities Education Act relief is appropriate if procedural violations deprive Joseph of an educational opportunity (prejudice) or seriously infringe his parents' opportunity to participate in the formulation of the individualized education plan. *W.G. v. Bd. of Trs. of Target Range Sch. Dist., No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("*Target Range*"). Appellants assert procedural violations which caused a denial of a free and appropriate public education. These include: (1) failure to undertake a medical examination for diagnostic or evaluation purposes leading to a completion of the audiology assessment, (2) failure to address the suspected vision disorder, (3) failure to consult or invite persons most knowledgeable about Joseph to assist in developing the individualized education plan, (4) development of the behavior intervention plan without considering the views of the individualized education plan team or Joseph's parents and (5) failure to assess Joseph using his primary language when it was feasible to do so.

**[2]** First, California Education Code § 56320(f) requires a student be tested in all areas related to the suspected disability. Cal. Educ. Code § 56320(f). The District undertook an audiology assessment and administered a HEAR Kit test. An

excessive buildup of cerumen (earwax) prevented the audiologist from reconciling inconsistent results. The District fulfilled its duty by notifying Joseph's mother (who was present and later reminded) that it was her obligation to remove the cerumen or have it removed by a medical professional as a condition for test completion. There was no procedural violation.

**[3]** Second, Appellants allege the vision assessment was flawed because the special education consultant was unqualified to assess for double vision or optic nerve damage. The District is not required to assess double vision or optic nerve damage if it does not affect a child's educational needs. *See* Cal. Educ. Code § 56320. Because the District's consultant found that Joseph's vision was not hindering his education, there was no procedural violation.

**[4]** Third, Appellants allege the District violated their procedural rights and denied Joseph an educational opportunity. The Appellants believe that failure to include and consider all available information from people knowledgeable about Joseph in the development of the individualized education plan violated the Act. Joseph has received that to which he is entitled. An individualized education plan has been developed for him as a result of his records, observations, assessments by qualified individuals and participation by his parents. *See* 20 U.S.C. § 1415(b)(1); Cal. Educ. Code § 56320(g); *Target Range*, 960 F.2d at 1484; 34 C.F.R. § 300.533(a)(1). A qualified administrator conducted a thorough hearing to review the individual education plan and, after considering testimony from Joseph's mother and the child's personal physician, largely approved of the District's proposal but supplemented the plan with further goals. *See* 20 U.S.C. § 1414(d)(1)(B)(vi). There was no procedural violation.

**[5]** Fourth, the District did not violate the Individuals with Disabilities Education Act's procedures when it conducted a suitable functional behavioral assessment and subsequently

proposed a behavior intervention plan. *See* 34 C.F.R. § 300.346. The individualized education plan team and Joseph's parents had an opportunity to discuss the plan when it was proposed. Joseph's mother exercised her rights by contesting the behavior intervention plan and then challenging the plan through the statutory procedures. There was no procedural violation.

[6] Fifth, Appellants allege the District's failure to assess Joseph in his primary language when it was feasible to do so was a procedural error that caused Joseph prejudice. The Individuals with Disabilities Education Act requires assessment materials be "provided and administered in the child's native language or other mode of communication, *unless it is not feasible to do so*." 20 U.S.C. § 1414(b)(3)(A)(ii) (emphasis added); *accord* Cal. Educ. Code § 56320(b)(1); 34 C.F.R. § 300.532; Cal. Code Regs. tit. 5, § 3023(a). Five assessments are at issue: speech and language, occupational therapy, physical therapy, vision and psychological. Joseph's mother consented to the assessment plan, which specified that the speech and language assessment was to be conducted in English. There was no procedural violation. The occupational therapy, physical therapy and vision assessments were nonverbal. There was no procedural violation. The psychological assessment was largely nonverbal. A Korean interpreter was present during the verbal portions of the assessment but direct verbal cues were not given in Korean. The Hearing Officer agreed with the psychologist that giving Korean cues would have disturbed the validity of the test; native language administration was not feasible. There was no procedural violation.[3]

---

[3]Even if we disagreed with the Hearing Officer and assumed without deciding that it was feasible (i.e., not detrimental to the assessment's validity) to give verbal cues in Korean, this limited portion of the psychological assessment would be the only evidence of procedural error. Such a procedural violation entitles Joseph to relief only if Appellants show it caused Joseph prejudice. *See Target Range*, 960 F.2d at 1484. Appellants offer no evidence that Joseph did not understand the cues given. There is no evidence that the results of the psychological assessment caused Joseph to be denied a suitable educational opportunity.

**B**

**[7]** Joseph has received a free and appropriate education if his instruction (1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities and (3) is in accord with the individualized education program. *Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995) (citing *Rowley*, 458 U.S. at 188-89). The parties do not dispute Joseph's needs or that the instruction is in accord with the individualized education plan that has been developed for Joseph. Appellants contend that the District failed to provide adequate support services to allow Joseph to meet the proposed educational goals. The Hearing Officer carefully considered testimony by the District and Appellants on the issue of related services. Though Appellants' witnesses testified that related therapy services could benefit Joseph, the District presented evidence that such services were not necessary for Joseph to reach the individualized education plan goals. The Hearing Officer's decision partially discredited Appellants' witnesses for using unreliable or invalid methods of testing. The Hearing Officer also agreed with the District that Joseph could achieve the goals of the individualized education plan through alternative communications, ongoing practice at home with his mother and ongoing adaptive physical education. Because we accord the Hearing Officer's findings due weight and the evidence does not conclusively demonstrate related therapy services are necessary to ensure Joseph receives "some educational benefit," we agree that there was no substantive violation of the Individuals with Disabilities Education Act. *Rowley*, 458 U.S. at 198-201.

**III**

**[8]** Compensatory education services can be awarded as appropriate equitable relief. 20 U.S.C. § 1415(i)(2)(B)(iii) ("shall grant such relief as the court determines appropriate"); *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489,

1496-97 (9th Cir. 1994). "Appropriate relief is relief designed to ensure the student is appropriately educated within the meaning of the Individuals with Disabilities Education Act." *Parents of Student W.*, 31 F.3d at 1497. The courts have discretion on how to craft the relief and "[t]here is no obligation to provide a day-for-day compensation for time missed." *Id.* We review the Hearing Officer's and the district court's award of compensatory education services for abuse of discretion. *Id.* at 1496.

After balancing the parties' conduct, the Hearing Officer concluded that while it was appropriate for Joseph to receive compensatory education it would be speculative to award services directly to Joseph. The testimony was unclear whether Joseph would benefit from direct compensatory education. The Hearing Officer decided to direct that the services be made available to Joseph's special education teacher in the amount of thirty minutes per week for the remainder of the 2002-2003 school year and to his Anaheim Union High School District teacher for the 2002-2003 extended school year. The Hearing Officer ordered that the services address the implementation of the individualized education plan's self-help goals and objectives. The district court affirmed the relief as ordered for Joseph's unique needs and the District's conduct.

**[9]** The award was designed to compensate Joseph for the District's violations by better training his teachers to meet Joseph's particular needs. The Individuals with Disabilities Education Act does not require compensatory education services to be awarded directly to the student. The Hearing Officer and the district court did not abuse their discretion when they awarded compensatory education services to Joseph in the form of individualized instruction for Joseph's teachers that addressed the implementation of the individualized education plan's self-help goals and objectives.

## IV

**[10]** "[T]he court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). Because the determination on an award of attorney's fees is solely with the district court, we review for abuse of discretion. *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 374 F.3d 857, 861 (9th Cir. 2004).

**[11]** The district court did not abuse its discretion by finding that the District prevailed on "all significant issues" and the Appellants prevailed only "on some minor issues." Though Appellants obtained some relief (a finding of denial of a free and appropriate public education for one extended school year and one period of less than three months, limited compensatory services awarded directly to the teachers, supplemented self-help goals and requiring the District to conduct a new functional behavior assessment and implement a behavior intervention plan), the District prevailed on all procedural violations issues and the larger substantive free and appropriate public education issue (the proposed individualized education plan of November 2002). The district court did not abuse its discretion by determining the Appellants' relief was de minimis. *See Shapiro*, 374 F.3d at 865 (citing *Parents of Student W.*, 31 F.3d at 1498). Though the district court might have been within its discretion to award Appellants attorney's fees, we cannot say the district court abused its discretion in not awarding fees.

**AFFIRMED.**

---

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's conclusions that (1) Park prevailed only on "minor" issues, and (2) the district

court did not abuse its discretion in denying his attorney's fees. The district court's determination that Park was not the prevailing party was an abuse of discretion. *See Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 374 F.3d 857, 865 (9th Cir. 2004). The majority mischaracterizes the issues on which Park prevailed as "minor" or "de minimis," even while conceding that "the district court might have been within its discretion to award [Joseph] attorney's fees." Given the very narrow discretion a district court has to deny fees in claims brought under the Individuals with Disabilities Education Act (IDEA), the majority opinion ignores not only the letter of the law, but also the spirit and purpose of allowing attorney's fees in cases where parents have been forced to litigate for years against school districts to get all or part of what the IDEA requires in the first place.

## I.

When Joseph Park was three years old, he was diagnosed with a rare genetic defect known as 5p-syndrome (also known as Cri du Chat syndrome), which is caused by a deletion on chromosome 5. At that time, according to Joseph's father, Joseph was able to speak only two words, and he was not yet walking. As a result of this disorder, Joseph has low muscle tone, suffers from speech and language delays and gross and fine motors skills delays, has difficulty in muscle training and coordination, and has deficient cognitive ability, limited verbal ability, and behavioral difficulties. Joseph has difficulty toilet training, is unable to control his drooling, and has difficulties buttoning and zipping his clothing and tying his shoes on his own.

Joseph attended elementary school within a special day class at the mainstream elementary school in the Magnolia District from the time he was three until June 2002, when he was twelve. In the spring of 2002, the Magnolia District conducted a triennial assessment of Joseph. The District concluded that for the 2001-2002 extended school year (ESY)

and the 2002-2003 school year, Joseph should be placed in the Hope School, a special education school on a small campus that is separated from the other local schools. Joseph's mother had concerns about the District's assessment of Joseph, and after visiting the Hope School in May 2002, she decided that Hope was not appropriate for Joseph. In June 2002, Joseph's mother exercised her right to request a due process hearing before the California Special Education Hearing Office. Because Joseph's mother did not agree with the placement in the restrictive Hope School, Joseph spent that summer at a church-operated summer camp program. During this time, Joseph's mother also arranged for Joseph to be evaluated by an independent speech-language therapist and an occupational therapist. In August 2002, the Anaheim District entered into a mediated interim agreement with Joseph. Pursuant to the agreement, Joseph was enrolled in a special day class for disabled children at the Lexington Junior High School, and the District formulated a plan for assessments of Joseph. The District's assessments of Joseph took place during September and October 2002 (and formed the basis for some of the claims Joseph Park presented before us). In November 2002, the District again concluded that the Hope School was an appropriate placement for Joseph, and it formulated Joseph's full educational plan and goals.

The due process hearing commenced later that month. The Hearing Officer rendered his decision four months later, in March 2003, determining that because it was not the least restrictive environment available, the Hope School was indeed not an appropriate placement for Joseph, as Joseph's mother had determined almost one year earlier, and holding that the District was required to supplement Joseph's self-help goals and objectives. Joseph's mother then exercised her right to pursue a civil action. In February 2004, the district court ordered the District to comply with the Hearing Officer's order. As a result, the District was required to formulate new goals and objectives for Joseph, to compensate Joseph's special education teacher for providing weekly occupational ther-

apy consultative services to Joseph, to undertake a new functional behavior assessment of Joseph, and to develop a behavior intervention plan for Joseph. Because of Joseph's mother's efforts in advocating for her son, Joseph obtained placement in a special day class at Lexington Junior High School. Instead of being cloistered in a segregated special education school, as the District had deemed acceptable, Joseph was able to attend a mainstream school and integrate into society as best he can, as is required by the IDEA. At the time of the due process hearing, Joseph was twelve years old. He is now sixteen and still fighting to obtain what is under the IDEA his statutory right.

## II.

The IDEA is the primary federal legislation that supports special education and related services for children with disabilities. The IDEA is premised on the notion that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). With that principle guiding the legislation, the IDEA seeks to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living"; "to ensure that the rights of children with disabilities and parents of such children are protected"; and "to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities." *Id.* § 1400(d)(1).

Federal funding for state and local educational agencies under the IDEA is conditioned on the requirement that states provide a free appropriate public education (FAPE) to each disabled child. 20 U.S.C. § 1412(a). When Congress enacted

the IDEA's predecessor, the Education for the Handicapped Act, in 1975, it authorized the federal government to pay up to 40% of the "excess" cost of educating a child with disabilities—the difference between the cost of educating a child with disabilities and the cost of educating a child without disabilities. *See* Congressional Research Service, Individuals with Disabilities Education Act (IDEA): Current Funding Trends, Feb. 11, 2005, at 8, *available at* http://digital.library. unt.edu/govdocs/crs//data/2005/upl-meta-crs-6209/RL32085_ 2005Feb11.pdf?PHPSESSID=a8756a35fe20505c3d9cd827 b6100443. Despite the authorization, however, federal funding has never matched the 40% goal. In FY 1995, Congress appropriated only $2,322,915,000 to states for education of school-aged with disabilities—only 7.80% of estimated excess cost. *Id.* at 9. Had Congress appropriated the amount it aspired to, the eligible states would have received $11,872,137,000. In FY 2002, at the time Joseph's struggle to obtain an appropriate education began, Congress appropriated $7,512,533,000, some 15.45% of excess cost, rather than $19,446,407,000, which would have totaled 40% of excess cost. While the percentage of excess cost that the federal government has provided to eligible states has continually increased throughout the years, appropriations still do not reach even 20% of increased cost despite numerous congressional pleas for "full funding" of the 40% goal. *See id.*; *see also* IDEA Full Funding Act, S. 2185, 109th Cong. (2006); Mandatory IDEA Full Funding Compromise Act, H.R. 3145, 109th Cong. (2005); Mandatory IDEA Full Funding Compromise Act, H.R. 3802, 108th Cong. (2004); IDEA Full-Funding Act of 2003, S. 939, 108th Cong. (2003); Full Funding for IDEA Now Act of 2003, H.R. 823, 108th Cong. (2003); Helping Children Succeed by Fully Funding the Individuals with Disability Education Act (IDEA), S. 466, 107th Cong. (2001); IDEA Full Funding Act of 2000, S. 2341, 106th Cong. (2000).

Given the failure to reach the goals set out when the IDEA and its predecessor were enacted, it is no surprise that states

and local school districts appear reluctant to provide truly appropriate public education for children with disabilities. At the time of the initiation of this action, school districts were being forced to pay for more than 85% of the cost of educating children with disabilities. At a time when general education in most school districts is increasingly underfunded, shouldering the burden of costly evaluations and education programs for disabled children grows more difficult every year. But the failure of Congress to reach 40% funding does not give states and school districts license to deny disabled children the education to which they are entitled. Under the IDEA, states receiving federal funding are required to provide every disabled child a free public education that is appropriate for the child's needs, no matter how inadequate that federal funding may be. That the districts are strapped for cash does not entitle them to skimp on an individual's education. Nor should it suggest to courts that they can decline to award attorney's fees in cases such as this where the parents of disabled children clearly prevail on significant issues.

## III.

For the purpose of attorney's fees awards, a prevailing party is defined as "a party which 'succeed[s] on any significant issue in litigation which achieves *some* of the benefit the parties sought in bringing the suit.' " *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1498 (9th Cir. 1994) (alteration in original) (emphasis added) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1988)). Park succeeded on several issues and achieved much of the benefit he sought in exercising his rights to a due process hearing and to bring a civil suit. The Hearing Officer determined, and the district court affirmed, that the District had denied Joseph a FAPE for the 2001-2002 extended school year (ESY) and for September 2002 through November 2002. To remedy the denial of a FAPE, the Hearing Officer required the District to provide compensatory education, which was awarded to Joseph in the form of services provided by his classroom teacher for thirty

minutes per week for the remainder of the 2002-2003 school year and ESY, relief which the district court affirmed. In addition, the Hearing Officer found that although the goals and objectives the District formulated were generally appropriate for Joseph, the District needed to supplement the proposed IEP for Joseph that was in place beginning in November 2002 by adding self-help goals for buttoning, zipping, and toilet training. Finally, the Hearing Officer agreed with Joseph's contention that the District had failed to offer Joseph an appropriate program at the Hope School and that the Hope School was not Joseph's "least restrictive environment." *See* 20 U.S.C. § 1412(a)(5)(A) (conditioning state eligibility for federal funding on requirement that states educate disabled children with nondisabled children and remove disabled children "from the regular educational environment . . . only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily"). Accordingly, the Hearing Officer called for implementation of a new functional behavior assessment (FBA) and behavioral intervention plan (BIP).

Park's successes cannot be regarded as insufficient to render Park a "prevailing party," even acknowledging that the District also prevailed on some issues. A party is "prevailing" where it can "point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989), *quoted in Kletzelman v. Capistrano Unified Sch. Dist.*, 91 F.3d 68, 71 (9th Cir. 1996); *see also Texas State Teachers Ass'n*, 489 U.S. at 792-93 ("The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties."). Park's successes satisfy this standard. As a result of Park's claim, the District was obligated to provide for consultative services by Joseph's special education teacher, to formulate self-help goals, to undertake an FBA, and to implement a new BIP. Park's litigation successes resulted in a significant

change in the District's legal obligations toward Park, which renders Park a prevailing party.

That Park failed to prevail on all of his claims does not preclude a determination that he was the prevailing party. A prevailing party need not succeed on all issues, but only on " '*any* significant issue.' " *Parents of Student W.*, 31 F.3d at 1498 (emphasis added) (quoting *Hensley*, 461 U.S. at 433). Moreover, a prevailing party need not achieve all of the relief claimed, but merely "some of the benefit the parties sought in bringing the suit." *Id.* (internal quotation marks omitted); *see also Shapiro*, 374 F.3d at 865 ("[I]t is also true that a party may be accorded prevailing party status by being awarded 'some relief by the court,' " (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603-04 (2001))); *Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.,* 321 F.3d 9, 15 (1st Cir. 2003) (noting that a prevailing party must "succeed on the merits of a claim or defense," but that "a party may be considered 'prevailing' even without obtaining a favorable final judgment on all (or even the most crucial) of her claims"), *quoted in Shapiro*, 374 F.3d at 865. Here, Park has clearly prevailed in obtaining some of the relief he sought.

Moreover, a prevailing party need not prevail on what may be considered the "central" issue of the case. In *Texas State Teachers Ass'n*, the Supreme Court found that the teachers' union was the prevailing party in its § 1983 claim challenging a school board policy, even though the union had not been granted relief on what was identified by a divided panel of the Fifth Circuit Court of Appeals as the "main thrust" of the action.[1] 489 U.S. at 787 (internal quotation marks omitted). Rejecting the "central issue" test for determining prevailing party status, the Court held that a party could be deemed "prevailing" even

---

[1] While *Texas State Teachers Ass'n* is a § 1983 case deciding a motion for attorney's fees under § 1988, the Ninth Circuit has adopted its reasoning and result in IDEA cases. *See, e.g.*, *Kletzelman*, 91 F.3d at 71.

despite failure on a "central" issue as long as the party had prevailed on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit." *Id.* at 792-93 (alteration in original) (internal quotation marks omitted). The Court noted that distinguishing between success on primary and secondary issues, or on central and tangential issues, is "essentially unhelpful" in defining a prevailing party. Thus, whether Park's successes are on "central" or "primary" issues is irrelevant; the only salient question is whether the claims on which he prevailed are significant.

Of course, despite the general rule that the degree of success does not bear on the threshold question of eligibility for an attorney's fees award, the Ninth Circuit has held that if success is insignificant, then a court may find that a party that succeeds on some claims is nonetheless not a prevailing party. Specifically, attorney's fees may be properly denied "[w]here the plaintiff's success on a legal claim can be characterized as purely technical or de minimis." *Kletzelman*, 91 F.3d at 71 (internal quotation marks omitted). Here, however, Park's successes materially altered the education he receives. Because he chose to exercise his rights under the IDEA, the District was forced to reassess the objectives and plan for Joseph Park's education and to provide for compensatory education to remedy its failure to provide a FAPE during several months of his education.

The issues on which Joseph prevailed are not technical or de minimis, as the majority would have it; rather, they go to the very essence of the IDEA. The determination by the Hearing Officer and the district court that Joseph was denied a FAPE the 2001-2002 ESY and for September 2002 through November 2002—even setting aside the other issues on which Joseph prevailed—is the most significant of successes possible under the IDEA. At the heart of the Act is the requirement that each disabled child receive a free appropriate public education that is tailored to his or her unique individual needs, *see* 20 U.S.C. § 1400(d)(1)(A), and the necessity of providing

education that is effective in "ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities," *see id.* § 1400(c)(1), (d)(4). It is impossible to reconcile the majority's conclusion that Joseph's success was "minor" with the goals and statutory framework of the IDEA.

The majority's decision to affirm the district court's denial of fees, even though Joseph succeeded in proving that the District denied him a FAPE and has obtained significant relief, offers only discouragement to families with disabled children. Denial of attorney's fees chills the exercise of their rights to pursue due process hearings and civil actions on similarly meritorious claims. It only encourages school districts to spend their resources fighting families who wish to vindicate their rights under the IDEA, rather than spending these resources where they should be spent—on providing public education to the disabled. Fee awards are generally the only mechanism through which disabled litigants with limited resources are able to vindicate their rights under the IDEA. The ability of plaintiffs to recover fees when they prove they have been denied their rights under the IDEA is central to the statutory framework of the Act. The fee provision of the IDEA, which originated in Congress's enactment of the Handicapped Children's Protection Act to overrule the Supreme Court holding in *Smith v. Robinson*, 468 U.S. 992 (1984), that the Education for the Handicapped Act (the IDEA's predecessor) did not allow attorney's fees for prevailing parties, allows plaintiffs to act as private attorneys general to exercise their rights. This is precisely why "[a] district court's discretion to deny a request for attorneys' fees is narrow." *Kletzelman*, 91 F.3d at 70 (citing *Abu-Sahyun v. Palo Alto Unified Sch. Dist.*, 843 F.2d 1250, 1252 (9th Cir. 1988)). If a district court's discretion to deny requests for attorneys' fees were not so narrow, attorneys would be loath to take on any IDEA claim in which the client may be unable to pay for representation. Joseph had a valid claim, which the Hearing Officer recognized, and for which the district court affirmed

Joseph merited relief. Lawyers will only bring these cases if they know that they will be compensated when they prevail. The majority's decision to affirm the denial of attorney's fees to a party which clearly prevailed on significant issues, despite the majority's own acknowledgment that fees "might have been" within the discretion of the district court, will serve not only to deny Joseph Park the relief he deserves, but also to encourage school districts to violate the IDEA, while further discouraging families of disabled children from fighting for their rights under the IDEA.