**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASHLAND SCHOOL DISTRICT,
    *Plaintiff-Appellee,*

v.

PARENTS OF STUDENT E.H.,
    *Defendant-Appellant.*

No. 08-35926

D.C. No.
1:07-cv-03019-CL

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted
October 8, 2009—Portland, Oregon

Filed December 7, 2009

Before: Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges, and Ronald M. Whyte,* District Judge.

Opinion by Judge O'Scannlain

*The Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

15919

## COUNSEL

Mary E. Broadhurst, of Eugene, Oregon, argued the cause for the defendant-appellant and filed the briefs.

Andrea L. Hungerford, of the Hungerford Law Firm, LLP, Oregon City, Oregon, argued the cause for the plaintiff-appellee and filed the brief. Nancy J. Hungerford, of the Hungerford Law Firm, LLP, Oregon City, Oregon, was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

In this action under the Individuals with Disabilities Education Act, we must decide the extent to which a district court must defer to a state hearing officer's decision to order a school district to reimburse a student's parents for the cost of a private education.

I

A

E.H.,[1] a student in the Ashland School District ("ASD"), first began suffering from emotional problems in 1998, while in the third grade. At the same time, E.H. began exhibiting difficulty with peer integration, was teased by other children, and developed migraine headaches. By 2000, E.H.'s fifth-grade year, the migraines became so severe that E.H.'s parents ("Parents") hospitalized their child. E.H.'s treating physician determined that the child was suffering from anxiety and depression, and that the migraines had a medical origin but were triggered by psychological factors.

At this time, ASD identified E.H. as eligible for special education services and developed an individualized education program ("IEP"), as required by the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1414(d). After ASD implemented this IEP, E.H. repeated the fifth grade, with improved results.

Throughout sixth grade and the first two trimesters of seventh grade, E.H. maintained strong academic performance, and even participated in a program at Southern Oregon Uni-

---

[1]As this case was filed under seal, we have disguised the student's name and omitted references to gender to retain anonymity.

versity for talented and gifted children. During the latter part of seventh grade, however, E.H. became depressed, began to talk about suicide, and suffered from frequent migraines that ultimately required hospitalization in the spring of 2003.

During eighth grade—the 2003 to 2004 school year—E.H. attended one class a day at Ashland Middle School, and spent the remainder of the school day at Willow Wind, an ASD-operated alternative education program. In September of that school year, ASD provided Parents with a twenty-three-page pamphlet that outlined their rights and responsibilities under the IDEA. Among other things, this pamphlet notified them that a court or hearing officer might refuse to reimburse them for private school costs if they failed to notify ASD of their objections to the IEP prior to private school enrollment. In late April 2004, near the end of E.H.'s eighth grade year, ASD held an IEP team meeting to consider strategies to smooth the transition to high school the following school year. Over the summer, E.H. was hospitalized on two occasions for suicide attempts. By this time, E.H.'s treating physicians and therapists were recommending residential treatment, rather than ordinary public school, to address E.H's persistent emotional and medical problems.

In September 2004, shortly after E.H.'s second discharge from the hospital, ASD reconvened its team to draft a new IEP. Parents indicated their desire to enroll E.H. in Willow Wind, as they had done the previous school year, but the program declined because it was unable to monitor the child closely enough to prevent another suicide attempt. Thus, ASD's personnel wrote a modified IEP for the next school year, to which Parents did not object. Although Parents enrolled E.H. full time at Ashland High School in the fall of 2004, they indicated to ASD that they were actively searching for a residential facility in which to place their child.

By late November 2004, E.H.'s emotional problems resurfaced. Parents and ASD agreed that homebound instruction

was appropriate, and ASD provided a tutor. ASD did not draft a new IEP because it believed that the home placement was only temporary pending the child's transfer to a private residential facility. In December 2004, E.H. was once again hospitalized for suicidal tendencies and threatening to injure family members. E.H. briefly returned to Ashland High School for a total of twelve days between December 14, 2004, and January 24, 2005. On January 24, Parents transferred E.H. from Ashland High School to Youth Care, a private out-of-state residential treatment program. Prior to this transfer, Parents never indicated any dissatisfaction with the education ASD provided the child, and ASD never volunteered that, under some circumstances, it was obligated to pay for residential educational facilities.

Youth Care operates several private residential educational facilities that provide both medical and educational support to enrolled students. E.H. initially attended its principal residential treatment program, located near Salt Lake City, Utah. Youth Care's treatment plan listed E.H.'s significant mental health challenges as chronic depression, repeated suicide attempts, and a homicidal fixation on E.H.'s father and sister. Youth Care provided psychological care, intensive counseling, and educational support sessions. In July 2005, Parents and Youth Care agreed to transfer E.H. to Youth Care's Pine Ridge facility, which offered less intensive psychological treatment.

On September 8, 2005—after E.H. had been enrolled in Youth Care for approximately seven months—Parents mailed ASD a formal letter indicating that they were unhappy with the educational services it had provided and requesting reimbursement for the cost of the residential placement. After receiving this letter, ASD convened a meeting to draft a new proposed IEP. Parents rejected that IEP in late January 2006, and requested a due process hearing before a state hearing officer to determine whether ASD had provided E.H. with a free appropriate public education ("FAPE") and whether they

were entitled to reimbursement for the costs of residential treatment.

B

The hearing officer concluded that the IEPs ASD offered in September 2004 and December 2005 did not provide E.H. with a FAPE, as required by the IDEA.[2] *See* 20 U.S.C. § 1400(d). The hearing officer further concluded that Youth Care did provide a FAPE and was therefore an appropriate placement. The hearing officer found that Parents had removed E.H. from Ashland High School without notifying ASD of their concerns with the education it was providing. Under Oregon Administrative Rule 581-015-0156(4) (2004)[3] —which required Parents to notify ASD of their concerns either at an IEP meeting or ten days prior to withdrawing E.H. —this failure permitted the hearing officer to deny or to reduce the amount of reimbursement.

For the period prior to September 18—ten days after Parents gave ASD notice of their objections to the IEP—the hearing officer ordered ASD to reimburse Parents for half of the cost of this residential program. He based this decision on three factors.

First, although Parents did not satisfy the notice requirement until September 8, 2005, ASD was aware they were exploring a possible residential placement by January 2004 at the very latest. In the hearing officer's opinion, this should

---

[2]The hearing officer also concluded that the home tutoring ASD provided E.H. in November and December of 2004 did not properly implement the September 2004 IEP.

[3]Since the parties appeared before the hearing officer, this section has been renumbered as Oregon Administrative Rule 581-015-2515. No material changes were made to the rule. Additionally, this rule tracks the language of 20 U.S.C. § 1412(a)(10)(C)(iii), which grants federal district courts the same discretion to reduce or deny an award of reimbursement if parents fail to provide a school district with pre-withdrawal notice.

have warned ASD that E.H. might need a residential place-
ment, which should have prompted it to consider the possibil-
ity of such placement when drafting the IEPs. ASD felt that
Parents were considering a residential placement because of
E.H.'s medical, rather than educational, needs, and therefore
it would not be obligated to pay for any residential treatment.
The hearing officer determined that because E.H.'s educa-
tional and medical problems were intertwined, ASD was obli-
gated to pay for residential treatment, and therefore
discounted this explanation.

Second, the hearing officer determined that Parents' failure
to complain about any of the IEPs cut in ASD's favor. The
hearing officer felt that the impact of this failure was tem-
pered, however, by ASD's failure to provide an appropriate
IEP.

Third, the hearing officer felt that ASD's failure to notify
Parents of its possible obligation to pay for residential care
also weighed in favor of granting reimbursement. ASD was
aware that Parents were considering a residential program
long before Parents placed E.H. in such a program, but did not
inform them of its potential responsibility to pay for that
placement. ASD had, on earlier occasions, provided Parents
with pamphlets describing their rights and obligations under
the IDEA, but there was no evidence that Parents received a
copy of this notice after September 2003. Thus, the hearing
officer felt that Parents' failure to provide notice of their
objections to the IEP was understandable, and concluded that
the lack of notice did not heavily favor ASD.

The hearing officer also granted Parents full reimbursement
for all residential care expenses for the period after September
18, 2005. Although Parents did not satisfy the notice require-
ment, he concluded that the foregoing considerations com-
pelled requiring ASD to reimburse Parents. Moreover,
because ASD had the statutorily required ten days notice with

respect to this time period, the hearing officer determined that it was proper to award Parents full reimbursement.

ASD appealed the hearing officer's decision to the U.S. District Court for the District of Oregon under 20 U.S.C. § 1415(i)(2).

## C

The district court reversed the hearing officer's award of reimbursement.[4] Conducting an independent review of the record, the district court determined that Parents are not entitled to reimbursement for the expenses associated with the residential placement either before or after they provided ASD with notice.

The district court's determination rested on several factors, such as the high cost of residential facilities; Parents' clear failure to adhere to the statutorily required notice requirement; the medical, rather than educational, nature of E.H.'s placement; Parents' failure to give ASD notice that they were rejecting the IEP; ASD's cooperation and willingness to revise E.H.'s IEP whenever Parents wished to change E.H.'s placement; and Parents' apparent unwillingness to consider returning E.H. to an ASD school.

The district court also rejected Parents' request for "interim relief"—or reimbursement for E.H.'s residential care during the allegedly delayed administrative proceedings—concluding that the hearing officer's decision was not unreasonably delayed. Parents timely appealed this decision.

---

[4]The district court did not consider the hearing officer's finding that ASD's September 2004 and December 2005 IEPs did not provide a FAPE or his finding that Youth Care did. As discussed *infra* at pages 15931-32, this omission is not relevant to our ultimate conclusion.

## II

Parents first contend that the district court applied the wrong standard of review to the hearing officer's decision.

## A

Parents argue that the district court reviews the hearing officer's decision to grant reimbursement for abuse of discretion. This claim relies on a misreading of the relevant statutory language and our precedent.

[1] Under 20 U.S.C. § 1415(i)(2)(C), the district court reviews the records of the state due process hearing, hears additional evidence offered by the parties, and then, "basing its decision on the preponderance of the evidence, . . . grant[s] such relief as the court determines is appropriate." Thus, the statute commands the district court to review the evidence and come to its own conclusion about what relief is appropriate. *See Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 369-70 (1996).

Parents cite our decision in *Parents of Student W. v. Puyallup School District, No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994), for the proposition that the district court reviews the hearing officer's decision for abuse of discretion. This is a misreading of *Student W.* There, we concluded that, because section 1415(i)(2)(C) grants the district court discretion to craft appropriate relief, we review *its* conclusion for abuse of discretion. *Id.* We did not discuss the standard of review the district court applies to hearing officer decisions.

[2] Contrary to Parents' assertion, a district court reviews a state hearing officer's award of reimbursement de novo under section 1415(i)(2)(C). *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996). It is true that section 1415(i)(2)(C) "carries with it the implied requirement that due weight shall be given to these proceedings." *Bd. of Educ. v.*

*Rowley*, 458 U.S. 175, 206 (1982). In other words, the court "must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful," *B.S.*, 82 F.3d at 1499, and avoid "substitut[ing] [its] own notions of sound educational policy for those of the school authorities which [it] review[s]," *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) (internal quotation marks omitted). In the end, however, the court is free to determine independently how much weight to give the state hearing officer's determinations. *See County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996); *Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 587-88 (9th Cir. 1992).

## B

**[3]** Parents also argue that the district court's relatively brief opinion did not satisfy the standard of review, citing our decision in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.), *aff'd sub. nom. Sch. Comm. v. Dept. of Educ.*, 471 U.S. 359 (1985). In *Gregory K.*, we held that a court "must consider the [hearing officer's] findings carefully and endeavor to respond to the hearing officer's resolution of each material issue." *Id.* The deference required by *Gregory K.* is nowhere near as great as Parents imply; after responding to the hearing officer's conclusions, "the court is free to accept or reject the findings in part or in whole." *Id.* Although we would have preferred that the district court's opinion were more detailed, it adequately responded to the hearing officer's conclusions before reaching a contrary result.

**[4]** It is true that the district court did not address the hearing officer's conclusion that the September 2004 IEP failed to provide E.H. with a FAPE, or his holding that Youth Care did provide E.H. with a FAPE. That failure does not mean, however, that the district court did not properly consider the hearing officer's conclusions. Although the hearing officer dedicated a majority of his opinion to evaluating the IEPs, the

district court, indeed, did not address the hearing officer's findings that E.H.'s September 2004 and December 2005 IEPs failed to provide E.H. with a FAPE. ASD did not appeal the hearing officer's determination that the September 2004 IEP was not adequate, and the district court therefore did not address it. With respect to the December 2005 IEP, the district court did not directly determine if it was proper; rather, it found that Parents' actions showed they were unlikely to place E.H. back in an ASD school even if the IEP was adequate. Thus, in the district court's opinion, Parents participated in the December 2005 IEP process not to help ASD prepare to provide their child with a FAPE, but merely as a prelude to seeking reimbursement. Thus, we are satisfied that the district court adequately responded to the hearing officer's conclusions, even if it did not do so directly.

Furthermore, the district court provided a clear rationale for its determination. For example, while the hearing officer concluded that residential placement was appropriate because he believed that E.H.'s medical and educational difficulties were intertwined, the district court instead concluded that Parents' decision to place E.H. in Youth Care was motivated primarily by their worries about E.H.'s medical condition. Similarly, Parents' failure to provide proper notice troubled the district court more than it did the hearing officer, as did their repeated failure to object to the many IEPs ASD prepared for E.H.

III

Having satisfied ourselves that the district court applied the proper standard of review to the hearing officer's conclusions, we turn to the merits of Parents' appeal.

A

[5] Parents argue that we must give deference to the hearing officer's conclusions. We disagree. Like the district court, we may not "substitute [our] own notions of sound educa-

tional policy for those of the school authorities which [we] review." *Smith*, 15 F.3d at 1524 (internal quotation marks omitted). At the same time, we do not review the hearing officer's conclusions for abuse of discretion. *Forest Grove Sch. Dist. v. T.A.*, 523 F.3d 1078, 1084-85 (9th Cir. 2008), *aff'd*, 129 S. Ct. 2484 (2009). Instead, we focus our review on the *district court's* decision.

**[6]** When a district court hears an appeal from a state hearing officer, it exercises broad discretion to craft relief under 20 U.S.C. § 1415(i)(2)(C). *See Sch. Comm. of Burlington*, 471 U.S. at 369-70. In a case such as this one, where Parents seek reimbursement for private school expenses, they "are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1994). "And even then courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2496 (2009); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii). Thus, because the district court had equitable discretion to craft appropriate relief in this case, we review its decision to deny reimbursement for abuse of that discretion. *T.A.*, 523 F.3d at 1084-85.

### B

Parents contend that the district court's conclusion that they are not entitled to reimbursement was predicated on several errors. We consider each of these claims in turn.

### 1

**[7]** Parents first claim that the district court improperly considered the high cost of residential treatment when it denied

their request for reimbursement. Although they are correct that the IDEA sometimes requires a school district to pay for a child's private education, we do not agree with their contention that the cost of E.H.'s residential treatment should necessarily be irrelevant to the district court's decision to grant or withhold reimbursement.

**[8]** When a student requires a residential placement, the IDEA requires a district to pay for reasonable, non-medical expenses associated with that placement. *See* 34 C.F.R. § 300.104; *cf. Carter*, 510 U.S. at 15-16. In denying Parents' request for reimbursement, the district court noted that much of the cost of residential care is directed to medical expenses. The district court concluded that much of E.H.'s medical care was unrelated to educational needs. Given that much of E.H.'s time in Youth Care was dedicated to psychological care, not education, we do not believe the district court abused its discretion by considering the cost of residential treatment.

2

Parents next argue that the district court improperly considered their failure to give ASD notice of their objections to E.H.'s IEP as a factor favoring denial of reimbursement. We disagree.

**[9]** Section 1412(a)(10)(C)(iii) grants the district court discretion to "reduce[ ] or den[y]" reimbursement if parents fail to notify a school district of their objections to their child's IEP prior to withdrawing the child from public school. This is fully consistent with the discretion conferred by section 1415(i)(2)(C). Thus, the statute expressly permitted the district court to deny relief solely because of Parents' failure to give ASD notice of their objections to the IEP. Moreover, we have previously held that failure to give notice is a relevant consideration when determining whether to deny reimbursement. *T.A.*, 523 F.3d at 1088-89.

**[10]** Parents argue that because ASD was aware that they were considering a residential treatment by, at the very latest, late January 2004, it cannot claim that it was harmed by their failure to give notice as required by section 1412(a)(10)(C)(iii). It is true that ASD was aware of the possibility that Parents might withdraw their child from public school in favor of a private residential facility. The district court, however, chose to give Parents' failure to provide notice greater weight than ASD's awareness that Parents might prefer a residential placement. We cannot conclude that this was an abuse of discretion.

3

**[11]** Parents also claim that the district court failed properly to consider ASD's role in causing their deficient notice by failing to provide them with additional notice of its potential obligation to pay for residential treatment. Although Parents acknowledge that they received a twenty-three-page pamphlet explaining their rights and obligations under the IDEA— including their obligation to give ASD notice before unilaterally transferring E.H. to a residential educational setting— Parents claim that ASD should have reminded them of this obligation once it knew they were considering a residential placement. We disagree.

**[12]** The IDEA requires ASD to notify Parents of their rights and obligations under the IDEA. *See* 20 U.S.C. § 1415(d) (setting out the notice requirement); *id.* § 1412(a)(10)(C)(iv)(I)(bb) (requiring the notice to explain that parents' failure to provide notice may preclude reimbursement). Parents do not argue that the pamphlet failed to provide them with adequate notice. ASD complied with the requirements of the IDEA. We—like the district court—may require no more.

4

**[13]** Finally, Parents challenge the district court's conclusion that E.H.'s residential placement was necessitated by

medical, rather than educational, concerns. The IDEA requires ASD to provide an education that meets E.H.'s "academic, social, health, emotional, communicative, physical and vocational needs." *B.S.*, 82 F.3d at 1500 (internal quotation marks omitted). Additionally, any IEP ASD prepares must include a statement of educational and related services that the district will provide to the child. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). "Related services" include "developmental, corrective, and other supportive services," such as "psychological services, physical and occupational therapy, recreation . . . [and] social work services." *Id.* § 1401(26). The IDEA does not, however, require ASD to address all of E.H.'s medical concerns. *See* 34 C.F.R. § 300.104 (requiring a school district to pay non-medical costs associated with residential treatment). Accordingly, "our analysis must focus on whether [the residential] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990).

Here, the district court concluded that "E.H. was not transferred to a residential facility because of educational deficiencies but for medical reasons. During at least the first six months [at Youth Care], E.H. was in no condition to devote much time or effort to schoolwork." Ultimately, the purposes underlying E.H.'s placement is a question of fact, and we review the district court's finding only for clear error. *T.A.*, 523 F.3d at 1083.

[14] The record contains ample evidence supporting the district court's conclusion that Parents placed E.H. in residential care to treat medical, not educational, problems. For example, E.H.'s case manager testified that Parents told him they were searching for a residential placement because of problems at home, not at school. Likewise, E.H. was hospitalized in early December 2004, for threatening to harm relatives

and classmates. E.H.'s treating physician recommended a residential placement only a few weeks before Parents enrolled their child in Youth Care. Given this evidence, we cannot conclude that the district court committed clear error in finding that the residential placement was necessitated by medical, rather than educational, needs. Therefore, it was not an abuse of discretion for the district court to conclude that the medical nature of the placement weighed against granting Parents' request for reimbursement.

5

In addition to the above, the district court discussed several other factors supporting its decision. These further convince us that, despite the relative brevity of the district court's opinion, it did not abuse its discretion by reversing the hearing officer's decision.

The district court concluded that Parents' late notice to ASD did not cure the earlier lack of notice. The district court noted that the purpose of the notice requirement is to give a school district one final opportunity to modify the student's IEP and craft an education plan that parents find acceptable. Given that E.H. has now been in a residential facility for a year, the district court concluded that Parents are unlikely to accept an IEP that calls for instruction at an ASD facility.

This conclusion also undermined Parents' claim that they were entitled to reimbursement because the September 2005 IEP was inadequate. ASD completed this IEP after receiving notice of Parents' intention to seek reimbursement for residential treatment. The district court found that Parents' participation in this process was not genuine, but rather was done solely as a prerequisite to seeking reimbursement.

The district court also noted ASD's continued cooperation with Parents' demands—specifically, its willingness to provide E.H. with home tutoring when migraines prevented

school attendance. Although the hearing officer found that homebound instruction was not a proper implementation of the September 2004 IEP, he also noted that ASD did not update the IEP or attempt to implement the existing one more fully because Parents had already indicated they would be moving E.H. to a residential program. Based on this information, the district court reasonably concluded that ASD acted properly.

Finally, the district court observed that prior to seeking reimbursement, Parents had never complained about any of the IEPs. The fact that Parents raised no objection to E.H.'s IEP until they realized that doing so was a prerequisite to reimbursement belies their claim that their complaint with the IEP is genuine.[5] Therefore, the district court did not abuse its discretion by considering this factor and rejecting Parents' claim for reimbursement.

Given the evidence before the district court, its consideration of each of these factors was proper.

C

Because each of the district court's conclusions was amply supported by the record, we cannot say that the district court abused its discretion by denying Parents' claim for reimbursement.

IV

[15] Because we conclude that the district court did not abuse its discretion by denying Parents' request for reimbursement under 20 U.S.C. § 1415(i)(2)(C), we must reach their alternative claim for reimbursement under the IDEA's "stay-put" provision. Once a state hearing officer concludes

---

[5]Additionally, such a complaint would have satisfied the notice requirement. *See* 20 U.S.C. § 1412(10)(C)(iii)(I)(aa).

that a residential placement is necessary to provide a child with a FAPE, the child's school district must pay for the cost of that placement for the pendency of any subsequent appeal. *See* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a), (d). Parents contend that because the hearing officer's decision was unreasonably delayed, their entitlement to relief under the stay put provision was improperly reduced. Thus, they claim that the district court abused its discretion denying their request for "interim" relief—reimbursement for E.H.'s residential treatment for the time period after the hearing officer should have issued his opinion but before he actually did. We disagree.

Parents argue that the hearing officer should have issued his order by June 12, 2006, and therefore ASD should reimburse them for E.H.'s residential care expenses from that date until the end of this litigation. They originally requested a due process hearing on January 26, 2006. Ordinarily, an Oregon hearing officer must issue his order within forty five days of a request for a due process hearing. Or. Admin. R. 581-015-2375(2).[6] In this case, the parties waived such time limit. On March 8, 2006, ASD moved to have Parents' suit dismissed, arguing that reimbursement was unavailable as a matter of law because they had failed to give the district notice of their intent to place E.H. in a residential facility. On March 31, 2006, the hearing officer partially granted ASD's motion, and denied all reimbursement for expenses prior to the period beginning ten days after Parents gave ASD proper notice. The hearing for this case took place between April 10 and 12, and the record closed on May 12. On May 31, the hearing officer granted Parents' request that he reconsider his March 31 decision to dismiss their claims for pre-notice relief and reopened the record. The additional hearing did not occur until November 2, and the hearing officer issued his new decision—this time in favor of Parents—on January 2, 2007.

---

[6]At the time of the parties' appearance before the hearing officer, the relevant regulation was numbered Or. Admin. R. 581-015-0088(2) (2003). Subsequent to the hearing officer's decision, this provision was renumbered; the text of the regulation has not changed in a material way.

Parents' contention that the hearing officer should have issued his decision on June 12, 2006 is based on the written agreement between the Oregon Department of Education and the Oregon Office of Administrative Hearings that was in force at the time of the parties' due process hearing.[7] Under that agreement, the hearing officer's decision should have been issued within thirty days of the close of evidence. Given that evidence in this case closed on May 12, 2006, the hearing officer's decision would ordinarily have been due on June 12, 2006.[8]

Parents point to several out-of-circuit cases to support their claim for "interim" relief. Although the stay-put provision does not directly authorize reimbursement for pre-decision expenses, courts may rely on the broad discretion contained in 20 U.S.C. § 1415(i)(2)(C) to require reimbursement if a hearing officer's decision is inappropriately delayed. *Cf. Sch. Comm. of Burlington*, 471 U.S. at 369 (holding that the IDEA grants district courts "broad discretion" to craft appropriate relief). For example, in *Mackey ex rel. Thomas M. v. Board of Education for Arlington Central School District*, 386 F.3d 158 (2d Cir. 2004), the Second Circuit awarded interim relief to a parent because the state's administrative decision was delayed for nearly a year. When the hearing officer finally issued his order determining the student's appropriate placement, the school year for which the parents should have been entitled to relief under the stay put provision had already ended. *Id.* at 164. The Second Circuit refused to allow the school district "to escape the financial consequences of pendency placement for which the District otherwise would have been responsible" because of a delay caused entirely by the state's hearing officer. *Id.*

---

[7]That agreement expired on June 30, 2007, and has been replaced with a new agreement which does not include the thirty day time limit to issue opinions.

[8]Technically, the thirty-day period ended on June 11. Because June 11 was a Sunday, however, the decision would not have been due until June 12.

**[16]** We need not reach the merits of the Second Circuit's approach, however, because Parents would not be entitled to relief under its reasoning. In *Mackey*, the administrative proceedings were unreasonably and unjustifiably delayed. Here, the district court found that the hearing officer's delay was not unreasonable. This determination is based on the numerous motions and briefs the parties filed, as well as the voluminous record. There were many motions before the hearing officer, and the district court reasonably concluded that he decided each motion in a timely fashion. Thus, the district court did not abuse its discretion by denying Parents' motion for interim relief.

V

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**